## WHITMAN v CITY OF BURTON

Docket No. 294703. Submitted January 12, 2011, at Detroit. Decided July
5, 2011, at 9:00 a.m. Leave to appeal granted, 491 Mich 913.

Bruce Whitman brought an action in the Genesee Circuit Court
against the city of Burton and the mayor of the city, Charles
Smiley, alleging that defendants violated the Whistleblowers'
Protection Act (WPA), MCL 15.361 *et seq.*, when the mayor
declined to reappoint plaintiff as police chief for the city in
November 2007. Plaintiff alleged that he was not reappointed
because, in early 2004, he had threatened to pursue criminal
charges against the mayor if the city did not comply with a city
ordinance and pay plaintiff for the unused sick, personal, and
vacation leave time he had accumulated in 2003. Defendants
maintained that plaintiff, along with other city administrators,
had agreed to forgo any payout for accumulated leave in order to
avoid a severe budgetary shortfall and that plaintiff was not
reappointed because the mayor was dissatisfied with many aspects
of plaintiff's performance as chief of police. A jury returned a
verdict in favor of plaintiff. The court, Geoffrey L. Neithercut, J.,
entered a judgment consistent with the verdict and thereafter
denied defendants' motion for judgment notwithstanding the
verdict or a new trial. Defendants appealed.

The Court of Appeals *held*:

1. A plaintiff, to establish a prima facie case under the WPA,
must show that the plaintiff was engaged in protected activity as
defined by the WPA, the plaintiff was discharged or discriminated
against, and a causal connection between the protected activity
and the discharge or adverse employment action. The purpose of
the WPA is to protect the public. When considering a retaliation
claim under the WPA, a critical inquiry is whether the employee
acted in good faith and with a desire to inform the public on
matters of public concern. The WPA is not intended to be used as
an offensive weapon by disgruntled employees.

2. It was in the public interest, in order to avoid a severe
budgetary shortfall, for plaintiff and the other city administrators
to forgo payment for unused leave in order to preserve essential
public services. In demanding payment under the ordinance,

plaintiff was decidedly not acting in the public interest, but in the thoroughly personal and private interest of securing a monetary benefit in order to maintain his lifestyle. Plaintiff's claim is not actionable under the WPA because his complaint amounted to a private dispute over plaintiff's entitlement to a monetary employment benefit and he acted entirely on his own behalf. There is no indication that good faith or the interests of society as a whole played any part in plaintiff's threatened decision to go to the authorities. Plaintiff asserted his own entitlement to payment and he dropped his threat of legal action when he received his money. No reasonable juror could conclude that plaintiff threatened to prosecute defendants out of an altruistic motive of protecting the public.

3. An employee may not recover under the WPA when the employee acts in bad faith. Plaintiff attempted to use the WPA as an offensive weapon. There is no protection under the WPA for plaintiff's conduct. The denial of defendants' motion for judgment notwithstanding the verdict was reversed and the case is remanded to the trial court for further proceedings.

Reversed and remanded.

BECKERING, J., dissenting, stated that plaintiff engaged in protected activity, as defined by the WPA, by reporting the violation, or suspected violation, of the city ordinance. Plaintiff presented sufficient evidence of a causal connection between his protected activity and the decision not to reappoint him as the chief of police. The protected activity need not be the only reason, or even the main reason, for the employee's discharge or nonreappointment, but it does have to be one of the reasons that made a difference in the decision. There was sufficient evidence for a reasonable juror to conclude that plaintiff's reporting of the ordinance violation was a factor that made a difference in the mayor's decisions not to reappoint him. There was evidence that, while plaintiff's personal financial status was a concern for him in reporting the violation of the ordinance, he also acted in the public interest. Plaintiff did not use the WPA as an offensive weapon or a tool for extortion. There was no evidence of bad faith. By stating that he would treat the payout policy issued by the mayor as an ordinance violation, plaintiff was fulfilling his duty as a police officer to uphold the law, which was certainly in the public interest. Plaintiff was not barred from recovering under the WPA. Plaintiff's desire to be paid under the ordinance for the benefits to which he was legally entitled may not be considered an improper motive without evidence of extortion, vindictiveness, or bad faith. The special jury instruction

requested by defendants regarding an improper motive in report-
ing a violation did not apply to the facts of this case. The trial court
did not abuse its discretion by denying defendants' motion for a
new trial that alleged that the court improperly refused to give the
special jury instruction. The trial court did not err by concluding
that the mayor is not entitled to a setoff for the pension benefits
paid to plaintiff by the city. The order awarding a judgment in
favor of plaintiff should have been affirmed.

MASTER AND SERVANT — LABOR RELATIONS — WHISTLEBLOWERS' PROTECTION ACT.

The purpose of the Whistleblowers' Protection Act is to protect the
public; a critical inquiry when considering a retaliation claim
under the act is whether the employee acted in good faith and with
a desire to inform the public on matters of public concern; the act
is not intended to be used as an offensive weapon by disgruntled
employees; an employee may not recover under the act when the
employee has acted in bad faith (MCL 15.361 *et seq.*).

*Tom R. Pabst* and *Michael A. Kowalko* for plaintiff.

*Plunkett Cooney* (by *Ernest R. Bazzana*) for defen-
dants.

Before: O'CONNELL, P.J., and SAAD and BECKERING, JJ.

SAAD, J. In this action under the Whistleblowers'
Protection Act (WPA), MCL 15.361 *et seq.*, a jury
returned a verdict in favor of plaintiff. For the reasons
set forth below, we reverse the trial court's denial of
defendants' motion for judgment notwithstanding the
verdict (JNOV) and remand for further proceedings
consistent with this opinion.

I. FACTS AND PROCEEDINGS

Plaintiff sued defendants under the WPA after defen-
dant city of Burton Mayor Charles Smiley declined to
reappoint plaintiff as the police chief for the city of
Burton in November 2007. Plaintiff's complaint alleged
that defendants terminated his employment because, in

January 2004, plaintiff complained to the mayor and a city attorney that it would be a violation of Burton City Ordinance 68-25C (Ordinance 68-C) if defendants failed to pay plaintiff for unused sick and personal leave time plaintiff accumulated in 2003. Ordinance 68-C, § 8(I) provides, in relevant part:

> Administrative Officers may accumulate unused sick/personal days until a 90 day accumulation has been created. Vacation days and unused holidays may also be credited for purposes of the accumulation. At the option of any administrative officer, any unused sick and/or personal, and/or vacation days may be paid in January in the year after which they are accumulated.

Defendants maintain that, when faced with significant budget problems in the city, plaintiff, along with other city administrators, agreed in March 2003 to forgo any payout for accumulated sick and personal time and to instead use their sick or personal time throughout the year. Plaintiff did not use much of his sick and personal time in 2003 and, after he demanded payment under the ordinance in early 2004 and threatened to pursue criminal charges against the mayor, defendants paid plaintiff $6,984 for his unused time. Defendants deny that Mayor Smiley decided to appoint another police chief in 2007 because of plaintiff's complaint involving Ordinance 68-C. Rather, defendants contend that the mayor was dissatisfied with many aspects of plaintiff's performance as chief of police. Following a four-day trial, the jury returned a verdict in favor of plaintiff and, thereafter, the trial court denied defendants' motion for JNOV or a new trial.

## II. ANALYSIS

As discussed, plaintiff claims that defendants violated the WPA by terminating his employment three

years after he threatened to pursue criminal charges if the city did not pay for his 2003 unused sick and vacation time. Plaintiff took the position at trial that his complaint about the Ordinance 68-C violation was a factor in the mayor's decision not to reappoint him as chief of police in 2007.

Defendants argue that the trial court should have granted their motion for JNOV because plaintiff did not establish a prima facie case under the WPA. "We review de novo a trial court's decision regarding a motion for JNOV." *Campbell v Dep't of Human Servs*, 286 Mich App 230, 241; 780 NW2d 586 (2009). "When reviewing the denial of a motion for JNOV, the appellate court views the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party to determine if a party was entitled to judgment as a matter of law." *Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009).

By 2003, due in part to changes in revenue sharing, the general fund for the city of Burton had lost approximately $50,000. Mayor Smiley testified that, in light of this significant budget shortfall, and to protect the jobs of city employees, he proposed that he and other city administrators agree to a wage freeze as well as a "use it or lose it" policy for sick and personal days, so that all administrators, including plaintiff, would not take a monetary payout for their unused time. At a meeting attended by plaintiff, but not the mayor, the administrators agreed to the mayor's proposal. Thereafter, the mayor announced the agreement in his state-of-the-city address, to the city council, and to the press.

Plaintiff maintained at trial that he did not agree to forfeit a payout for his sick and vacation hours. Shortly after the "agreement" was reached in March 2003,

plaintiff sent a letter to the mayor complaining that it was an unfair elimination of one of his benefits. Plaintiff wrote:

> Up to my appointment as Chief I was involved in the Police union and throughout my career attained benefits through collective bargaining as you well know. Historically we were given things in lieu of wage increases including additional holidays, vacation and sick and personal time as well as other fringe benefits. My current life style revolves around these very things that have been negotiated for me and in some cases protected several times over through binding arbitration (pension). My family looks forward to the financial benefits I receive by not missing time from work. I have always enjoyed my job and was raised with the ideal that hard work and dedication does come with rewards and although City Administrators across the board are underpaid, this compensation at the end of the year, to me, justifies it and rewards me for dedicated work.

Notwithstanding his dislike for the policy, plaintiff did not state in the letter that he would demand payment for his unused time and he did not state that the agreement to forgo the annual payout would violate any Burton ordinance.

Nonetheless, and despite his apparent understanding of the agreement, plaintiff did not use many of his sick or vacation days during the remainder of 2003 and, on January 9, 2004, plaintiff sent a letter to Mayor Smiley demanding payment:

> Please be advised that under section I of ordinance 68-25 "C" I am requesting to exercise my option as stated, that all of my unused sick/personal days and unused vacation days be paid to me in January as required in this ordinance.

* * *

To ignore issues specified in that ordinance would be a direct overt violation of that ordinance and I fully intend to address the violation should it occur.

Plaintiff also sent a letter to city attorney Richard Hamilton on January 23, 2004, as a follow-up to a conversation they had earlier in the month. Plaintiff's letter provided, in relevant part:

Having this use it or lose it proposal thrown on me I resorted to the very document that the mayor refers to, 68-c. It is very clear in that ordinance that administrators are entitled to and can receive their unused days as specified by ordinance. Following the letter of the law, I made a formal written request for my unused days to be paid to me in January as specified by ordinance, (copy attached).

At a staff meeting with the Mayor on January 12, 2004 he referred to the fact that we "waived" our right to receive paid days. I completely disagree, this is wrong and I will not accept this as fact that the mayor can decide what I have waived when it comes to an ordinance protected benefit that is dictated by the council. Some will state they agreed to this and I find this quite interesting, especially in the manner it was delivered to us.

My position is this, this is a violation of the ordinance, I told the mayor on the 12th it was an ordinance violation and that I had talked to you about this and I expected it to be addressed. Living by the letter of this ordinance, I will wait until January passes to pursue this. If I need to re address through the council I will, if you have any input on resolving this I would appreciate it or I will be forced to pursue this as a violation of the law and will address it as such.

The city attorney advised Mayor Smiley that a failure to pay plaintiff would be contrary to Ordinance 68-C, and, shortly thereafter, plaintiff received a check for his unused sick and vacation hours.

Mayor Smiley testified that he was upset about plaintiff's demand for payment as he viewed this as plaintiff "going back on his word" because all the administrators had agreed to forgo the payments, plaintiff did not abide by the agreement, and the mayor had already issued a press release about the agreement. Some other administrators were also angry with plaintiff because they had used their sick and vacation time during the year with the understanding that they would not receive any payment for it and they believed plaintiff "sandbagged" the city by making his claim only after the right to these payments ripened. Nonetheless, Mayor Smiley testified that he and plaintiff overcame their differences about the issue and he denied that this factored into his decision not to reappoint plaintiff in 2007. Rather, Mayor Smiley testified that there were numerous problems with plaintiff's performance as police chief over the next three years. In addition to various complaints from police officers about plaintiff and the low morale in the department, Mayor Smiley cited plaintiff's inadequate discipline of three officers who had followed the mayor's car in an unsuccessful attempt to arrest the mayor for a driving offense after he visited a local pub, a lack of communication from plaintiff about the police department's operations and activities, numerous sexually explicit e-mails plaintiff sent on his city computer in clear violation of city policy, plaintiff's failure to inform the mayor about the failure to discipline an intoxicated, off-duty police officer who shot someone in the chest with a Simunition nonlethal training gun, plaintiff's involvement in denying employment to a qualified police department applicant, his retention of an officer who was deemed unqualified by her supervising officers, his issuance of a retirement identification card that allowed an unqualified former police officer to carry a gun, plaintiff's failure to act on

the complaint of a local business owner about harassment by Flint police officers, and a misleading budget report plaintiff made to the city council.

Mayor Smiley informed plaintiff that he did not intend to reappoint him as police chief on November 27, 2007. Plaintiff took the position at trial that his complaint about the Ordinance 68-C violation was causally connected to the mayor's decision because the mayor raised it as an example of his problems with plaintiff both before and after plaintiff's termination. Plaintiff specifically alleged that, by failing to reappoint him as the chief of police, defendants violated § 2 of the WPA, MCL 15.362, which states:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

"To establish a prima facie case under [the WPA], a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 183-184; 665 NW2d 468 (2003).

We hold that, as a matter of law, plaintiff could not recover damages under the WPA for the mayor's decision not to reappoint him because, in threatening to

inform the city council or prosecute the mayor for a violation of Ordinance 68-C, plaintiff clearly intended to advance his own financial interests. He did not pursue the matter to inform the public on a matter of public concern.

"[T]he purpose of the WPA is to protect the public." *Henry v Detroit*, 234 Mich App 405, 413 n 1; 594 NW2d 107 (1999). As our Supreme Court explained in *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378-379; 563 NW2d 23 (1997):

> Michigan's Whistleblowers' Protection Act was first enacted in 1981, largely in response to the accidental PBB-contamination of livestock feed. The act "encourage[s] employees to assist in law enforcement and . . . protect[s] those employees who engage in whistleblowing activities." [*Dudewicz v Norris Schmid, Inc*, 443 Mich 68, 83; 503 NW2d 645 (1993) (BOYLE, J., dissenting), overruled in part on other grounds by *Brown v Detroit Mayor*, 478 Mich 589, 594 n 2; 734 NW2d 514 (2007).] It does so with an eye toward promoting public health and safety. The underlying purpose of the act is protection of the public. The act meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law. Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses.

Accordingly, by enacting the statute, the Legislature sought "to alleviate 'the inability to combat corruption or criminally irresponsible behavior in the conduct of government or large businesses.' " *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604, 612; 566 NW2d 571 (1997), quoting *Dudewicz*, 443 Mich at 75. To encourage employees to expose corruption or criminal conduct, the WPA "prohibits future employer re-

prisals" when an employee reports or is about to report such conduct. *Shallal*, 455 Mich at 612.

In order to effectuate the purpose of the WPA, our courts have ruled that, when considering a retaliation claim under the act, a critical inquiry is whether the employee acted in good faith and with " 'a desire to inform the public on matters of public concern . . . .' " *Id.* at 621, quoting *Wolcott v Champion Int'l Corp*, 691 F Supp 1052, 1065 (WD Mich, 1987). To that end, it is well settled that the Legislature did not intend " 'the Whistleblowers Act to be used as an offensive weapon by disgruntled employees.' " *Shallal*, 455 Mich at 622, quoting *Wolcott*, 691 F Supp at 1066.

The mayor of Burton agreed with his administrators to forgo cash payouts to save money and to demonstrate to the public that the administration was taking fiscally responsible action to save public funds while retaining needed city services. There is no dispute that the decision and subsequent agreement by the administrators to avoid thousands of dollars in cash payouts was a strategy to counteract a severe budgetary shortfall that, without some corrective measure, would likely have resulted in the termination of other public-service employees. Thus, it was in the public interest for plaintiff and the other administrators to forgo this administrative perk, in order to preserve essential public services.

In demanding payment under the ordinance for his sick and personal hours—a payment the cash-strapped city could ill afford—plaintiff was decidedly *not* acting in the public interest, but in the thoroughly personal and private interest of securing a monetary benefit in order to maintain his "life style." Plaintiff's claim is not actionable under the WPA because his complaint amounted to a private dispute over plaintiff's entitle-

ment to a monetary employment benefit. Moreover, plaintiff acted entirely on his own behalf. Indeed, nowhere in the voluminous record "is there any indication that good faith or the interests of society as a whole played any part in plaintiff's [threatened] decision to go to the authorities." *Wolcott*, 691 F Supp at 1063. To the contrary, plaintiff asserted his own entitlement to payment and he dropped his threat of legal action when he received his money. Under these facts, no reasonable juror could conclude that plaintiff threatened to prosecute defendants "out of an altruistic motive of protecting the public." *Shallal*, 455 Mich at 622.

Moreover, an employee also may not recover under the WPA when the employee acts in bad faith. *Id.* at 621. Here, as noted earlier in this opinion, plaintiff withheld his accusation of a legal violation until after he accumulated thousands of dollars' worth of sick and vacation time. Once the mayor reported the agreement to the city council and the public, plaintiff spent the next several months stockpiling his hours and, when most personally advantageous, threatened legal action if defendants did not pay plaintiff for them. While this case differs factually from *Shallal* because the plaintiff in *Shallal* withheld her threat to report until her termination was imminent, we believe this case amounts to a similar, and prohibited, attempt to use the WPA " 'as an offensive weapon by [a] disgruntled employee[].' " *Id.* at 622, quoting *Wolcott*, 691 F Supp at 1066. Plaintiff expressed personal displeasure with the agreement to forgo his lump-sum payment, he remained silent about the claimed wrong for months, and then raised it as a legal issue—not for the purpose of preventing injury to the public, but for personal reasons and only when most personally beneficial. There is no protection afforded under the WPA for such conduct. *Id.*; *Wolcott*, 691 F Supp at 1065.

Because no juror could legally find in favor of plaintiff on his claim under the WPA, we reverse the trial court's denial of defendants' motion for JNOV, and remand for further proceedings consistent with this opinion.[1] We do not retain jurisdiction.

O'CONNELL, P.J., concurred with SAAD, J.

BECKERING, J. (*dissenting*). I respectfully dissent. Defendants, the city of Burton (the city) and Charles Smiley, appeal as of right the judgment entered in favor of plaintiff, Bruce Whitman, following a jury trial in this action brought under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.* I would affirm.

I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In March 2002, Smiley, the mayor of the city, appointed plaintiff as police chief. The city charter provides, at § 6.2(b), that mayoral appointees "serve at the pleasure of the Mayor for indefinite terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election . . . ." Plaintiff remained police chief until November 2007, when, after an election, Smiley declined to reappoint plaintiff to the position.

According to plaintiff, Smiley's decision not to reappoint him was causally connected to previous incidents when plaintiff reported a policy issued by Smiley as a violation of a city ordinance. Burton City Ordinance No.

---

[1] In light of this ruling, we need not address defendants' remaining arguments on appeal, but note on the causation issue that even if plaintiff could be viewed as stating a cause of action under the WPA, there is overwhelming evidence of plaintiff's misconduct in office that more than justified the mayor's decision not to reappoint plaintiff as police chief.

68-25C, § 8(I) (Ordinance 68C), which permitted un-elected city officers to be paid for unused sick, personal, and vacation days, stated, in part:

> Administrative officers [meaning unelected officers] may accumulate unused sick/personal days until a 90 day accumulation has been created. Vacation days and unused holidays may also be credited for purposes of the accumulation. *At the option of any administrative officer, any unused sick and/or personal, and/or vacation days may be paid* in January in the year after which they are accumulated. [Emphasis added.]

In early 2003, an election year, Smiley held a meeting with the city department heads regarding the city's worsening financial situation. Smiley, stating that all possible measures should be taken to keep city employees working, noted that the city paid a large amount of money each year for employees' unused vacation days. At a later meeting, which Smiley did not attend, the department heads agreed to a pay freeze and that all vacation days had to be used within the calendar year, with no employee payouts for unused days. Smiley prepared a memorandum of this "gentlemen's agreement" and distributed it to administrators, including plaintiff, on March 18, 2003.

On March 20, 2003, plaintiff sent Smiley a letter objecting to the plan in Smiley's memorandum. He stated that his lifestyle revolved around "these very things that have been negotiated for me . . . . My family looks forward to the financial benefits I receive by not missing time from work."

In the 2003 election, Smiley was reelected, and he subsequently reappointed plaintiff as police chief. On January 9, 2004, plaintiff sent a letter to Smiley requesting a payout for his unused days in 2003 under Ordinance 68C. The letter further stated:

Although I have a great deal of respect for you as a person and as our mayor, I do not feel that issuing a confidential memo that affects ones [sic] wages and benefits that are set by ordinance, can supersede that very ordinance.

*To ignore issues specified in that ordinance would be a direct overt violation of that ordinance* and I fully intend to address the violation should it occur. [Emphasis added.]

On January 12, 2004, Smiley held a staff meeting. Smiley stated, according to plaintiff, that there would be no payouts for unused vacation days, arguing that the administrators had waived their right to receive such payouts. Plaintiff told Smiley that he had talked to a city attorney about this issue, that refusing to pay employees for unused days was an ordinance violation, and that he expected the violation to be addressed.

On January 15, 2004, plaintiff wrote a letter to Dennis Lowthian, an administrative officer for the city who had been acting as a spokesperson for all the administrative officers. In the letter, plaintiff stated: "I cannot allow them to violate the ordinance by 'forcing waivers' of ordinance[-]given rights. *I believe it is my job as a police officer to point the violation out* and I will pursue it as far as it needs to go." (Emphasis added.) On January 23, 2004, plaintiff wrote a letter to Richard Hamilton, a city attorney for matters other than labor and employment. Plaintiff, asserting that the failure of the city to pay him for unused vacation days was a violation of Ordinance 68C, stated:

My position is this, this *is a violation of the ordinance* [*and*] *I told the mayor on the 12th it was an ordinance violation* . . . . If I need to re address [the issue] through the council I will, if you have any input on resolving this I would appreciate it or *I will be forced to pursue this as a violation of the law and will address it as such.* [Emphasis added.]

Plaintiff also stated that "[t]his ordinance was not re addressed in regards to these benefits during the past year and the Mayor and council clearly had ample time to bring this up and I expected them to [do so] after the memo of March 03." Defense counsel admitted at trial that Smiley was told about the January 23, 2004, letter, and Hamilton testified that he told Smiley about the letter. But Smiley denied that Hamilton talked with him about it.

Thereafter, the city's labor and employment attorney, Dennis Dubay, advised the city that the payouts for unused days had to be made because Ordinance 68C had not been amended to reflect the "gentlemen's agreement" not to make the payouts. According to Smiley's testimony, Dubay told him, "Chuck, you can't make a gentlemen's agreement to drive 55 [miles per hour] when the speed limit is posted at 45 . . . ." On January 29, 2004, the city authorized monetary payouts for unused vacation and sick days to all officers who had requested it, including plaintiff.

Smiley testified that on March 28, 2004, he had a couple of alcoholic drinks at a local bar. The owner of the bar, Bob Lindsey, offered to drive Smiley home. Lindsey drove Smiley in Smiley's city-issued vehicle. Right after they left the parking lot, city police officers in three cruisers stopped them. One of the officers was slated to be laid off. Plaintiff conducted an investigation of the incident and disciplined the officers in May 2004. But Smiley allegedly felt that the discipline was too mild and was unhappy with the way plaintiff handled the matter.

On June 7, 2004, Smiley issued a letter to plaintiff, indicating that he was considering removing plaintiff as police chief. Later that day, Smiley met with plaintiff and city employee Mark Udell. According to plaintiff,

Smiley angrily pointed his finger in plaintiff's face and yelled, "You threatened to have me prosecuted over the 68C vacation pay issue." Udell took notes, which stated: "Mayor — no trust — 68-C (vacation) — lack of communication . . . ."

Plaintiff asserts that his performance as police chief was good. Morale was high, he received awards, and there were no disciplinary actions against him. In April 2004 he received an award as police administrator of the year, a statewide award. Plaintiff again received a statewide award in October 2004. Plaintiff did, however, admit to exchanging sexually explicit e-mails during work hours.

Smiley was reelected as mayor in November 2007. Following his reelection, Smiley directed each department head, including plaintiff, to submit a resume to him, if he or she wanted to be reappointed. Later that month, Smiley declined to reappoint plaintiff as police chief. Smiley publicly stated that he wanted the police department to go in a new direction and to have more discipline in the department. But Smiley testified that the actual reasons he did not reappoint plaintiff were unnecessary for the public to know and that he was trying to protect plaintiff and the police department from embarrassment. On December 1, 2007, plaintiff began receiving pension benefits.

Later in December 2007, Smiley met with lieutenants and sergeants in the police department to discuss a possible replacement for plaintiff. At the meeting, Smiley mentioned that he and plaintiff "got off on the wrong foot" because of the Ordinance 68C issue. Sergeant Michael Odette testified that Smiley brought up the issue. Similarly, according to Lieutenant Thomas Osterholzer's testimony, Smiley acknowledged that

plaintiff's conduct related to the ordinance got them off to "a rocky start" and "on the wrong foot."

Plaintiff filed suit against defendants in February 2008, alleging a violation of the WPA. At trial, the jury found in plaintiff's favor, answering special interrogatories on the verdict form, finding that plaintiff engaged in protected conduct and that his protected conduct made a difference in Smiley's failure to reappoint plaintiff. The jury found plaintiff's past economic damages to be $97,500 for 2007 and 2008, future economic damages of $130,000 ($65,000 for each of the years 2009 and 2010), and noneconomic damages of $5,000, for a grand total of $232,500. The verdict form did not provide separate awards against each of the two defendants.

The trial court subsequently entered judgment for plaintiff.[1] Thereafter, defendants moved for judgment notwithstanding the verdict (JNOV) or a new trial. The trial court denied defendants' motion.

Defendants now appeal as of right.

## II. DEFENDANTS' MOTION FOR JNOV

Defendants first argue on appeal that the trial court erred by denying their motion for JNOV. A trial court's ruling on a motion for JNOV is reviewed de novo on appeal. *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 272; 696 NW2d 646 (2005). When

---

[1] In the judgment, the trial court stated that the verdict amount of $232,500 stood, unchanged, vis-à-vis Smiley (plus attorney fees of $64,874.25, for a total of $297,374.25), but that the city only owed plaintiff $53,981.78, because the court held that the pension benefits received by plaintiff would be an offset against the liability of the city, but not against the liability of Smiley. The judgment also stated that any money paid by the city "shall correspondingly reduce the judgment amount owed by . . . Smiley."

ruling on a motion for JNOV, a trial court should consider the evidence and all legitimate inferences arising therefrom in the light most favorable to the nonmoving party. *Reed v Yackell*, 473 Mich 520, 528; 703 NW2d 1 (2005) (opinion by TAYLOR, C.J.). "A trial court should grant a motion for JNOV only when there was insufficient evidence presented to create an issue for the jury." *Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633 (1999). If the evidence is such that reasonable jurors could disagree, JNOV is not properly granted. *Foreman v Foreman*, 266 Mich App 132, 136; 701 NW2d 167 (2005).

The WPA, which imposes a duty on employers not to fire whistleblowers for reporting a violation of law, states, in part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment *because the employee . . . reports or is about to report*, verbally or in writing, *a violation or a suspected violation* of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false . . . . [MCL 15.362 (emphasis added).]

As noted by the majority, "[t]o establish a prima facie case under this statute, a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act [i.e., reporting or being about to report a violation or suspected violation of law], (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *West v Gen Motors Corp*, 469 Mich 177, 183-184; 665 NW2d 468 (2003).

## A. PROTECTED ACTIVITY

Defendants assert that plaintiff failed to establish that he engaged in a protected activity. I disagree.

Plaintiff engaged in a protected activity, as defined by the WPA, by reporting the violation, or what was at least suspected to be a violation, of ordinance 68C to the city. Smiley's March 18, 2003, memorandum stated that there would be no payouts for officers' unused vacation days, effective immediately. Smiley's policy to discontinue payouts was contrary to Ordinance 68C, which permitted unelected city officers to be paid for unused sick, personal, and vacation days. Plaintiff believed that Smiley was committing an ordinance violation, and he reported it as such to Smiley himself, city administrative officer Lowthian, and city attorney Hamilton.

According to defendants, plaintiff did not engage in protected activity because he acted in his own financial interest, not in the public interest. Defendants cite *Wolcott v Champion Int'l Corp*, 691 F Supp 1052 (WD Mich, 1987), *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604; 566 NW2d 571 (1997), and *Robinson v Radian, Inc*, 624 F Supp 2d 617 (ED Mich, 2008), in support of this assertion. But those cases do not stand for the proposition that "where the primary motivation of an employee is personal gain, the employee necessarily fails to establish the requisite 'protected activity,' " as suggested by defendants. Rather, as will be discussed below, those cases address an employee's motivation in reporting a violation of law in regard to the question of causation. Here, plaintiff engaged in a protected activity by reporting a violation of Ordinance 68C to the city, and there is no dispute that he was later discharged from his position through Smiley's decision not to reappoint him.

B. CAUSAL CONNECTION

Defendants next assert that plaintiff failed to establish a causal connection between his protected activity and his subsequent discharge. Again, I disagree. I would hold that plaintiff presented sufficient evidence of causation to create an issue for the jury.

1. SMILEY'S DECISION NOT TO REAPPOINT PLAINTIFF

The model civil jury instruction regarding causation in WPA claims states that the protected activity need not be the only reason, or even the main reason, for the employee's discharge, but it does have to be *one of the reasons that made a difference* in the decision to discharge. M Civ JI 107.03. Thus, to establish a prima facie claim under the WPA, plaintiff was required to show that one of the reasons that made a difference in Smiley's decision not to reappoint him was the fact that plaintiff had reported the violation of Ordinance 68C.

Viewing the evidence presented at trial in the light most favorable to plaintiff, there was sufficient evidence for a reasonable juror to conclude that plaintiff's reporting of the ordinance violation made a difference in Smiley's decision not to reappoint him. First, there was evidence that Smiley was aware that plaintiff reported the ordinance violation. In his January 9, 2004, letter to Smiley, plaintiff stated: "I do not feel that issuing a confidential memo that affects ones [sic] wages and benefits that are set by ordinance, can supersede that very ordinance. To ignore issues specified in that ordinance would be a direct overt violation of that ordinance and I fully intend to address the violation should it occur." At the January 12, 2004, staff meeting, plaintiff told Smiley that he had talked to a city attorney about the payout issue, that refusing to pay em-

ployees for unused days was an ordinance violation, and
that he expected the violation to be addressed. There
was also testimony that Smiley was aware of plaintiff's
January 23, 2004, letter to Hamilton, wherein plaintiff
reported the violation. Although Smiley testified that
he did not discuss the letter with Hamilton, Hamilton
testified that he did, in fact, tell Smiley about the letter.
It is the fact-finder's responsibility to determine the
credibility and weight of the testimony. *Wiley v Henry
Ford Cottage Hosp*, 257 Mich App 488, 491; 668 NW2d
402 (2003).

Further, although there was evidence that there may
have been a variety of reasons for Smiley's decision not
to reappoint plaintiff, such as plaintiff's allegedly inad-
equate discipline of the officers who stopped Smiley
after his visit to the local bar, sexually explicit e-mails
sent by plaintiff, and other reasons described by the
majority, there was also evidence that plaintiff's report-
ing of the ordinance violation was another reason that
made a difference in Smiley's decision. On June 7, 2004,
Smiley sent plaintiff a letter stating that he was con-
sidering removing plaintiff as police chief. Plaintiff
testified that at their meeting later that day, Smiley
angrily pointed at his face and yelled, "You threatened
to have me prosecuted over the 68C vacation pay issue."
Udell's meeting notes stated: "Mayor — no trust —
68-C (vacation) — lack of communication . . . ." While
Smiley did not immediately fire plaintiff as threatened,
and plaintiff remained police chief through November
2007, a reasonable juror could have concluded that the
Ordinance 68C issue was still on Smiley's mind when he
decided not to reappoint plaintiff. The incident when
plaintiff allegedly failed to adequately discipline the
police officers who had stopped Smiley's vehicle after he
left the bar, which was one of Smiley's purported
reasons for not reappointing plaintiff, occurred in

March 2004. Thus, by Smiley's own admission, there were incidents going back as far as 2004 that made a difference in his decision-making in 2007. Moreover, at the December 2007 meeting of city police lieutenants and sergeants, just after plaintiff's discharge, Smiley mentioned that he and plaintiff "got off on the wrong foot" because of the Ordinance 68C issue. Plaintiff testified that after the meeting, which he had not attended, he asked two sergeants and a lieutenant whether the reason for his discharge had been discussed. They all said that the reason had been discussed and that "it all goes back to" the Ordinance 68C issue. Sergeant Odette testified that Smiley said that he had not been happy with plaintiff since early after his appointment, citing the payout issue. Viewing this evidence in the light most favorable to plaintiff, there was sufficient evidence for a reasonable juror to find that plaintiff's protected activity was *a* factor that made a difference in his discharge.

### 2. PLAINTIFF'S MOTIVATION FOR "BLOWING THE WHISTLE"

The majority concludes that plaintiff cannot recover under the WPA because he "intended to advance his own financial interests," "not [to] pursue the matter to inform the public on a matter of public concern." I would hold, however, that while plaintiff's personal financial status was a concern for him in reporting the violation of Ordinance 68C, there was evidence that he acted in the public interest. This case is factually distinguishable from the cases relied on by defendants and the majority, i.e., *Wolcott*, *Shallal*, and *Robinson*, in which the plaintiffs refrained ·from "blowing the whistle" until it was most advantageous to themselves, using the WPA as a tool of extortion.

In *Robinson*, the United States District Court for the Eastern District of Michigan summarized the facts and holdings in *Wolcott* and *Shallal*, stating:

> In *Wolcott*, the plaintiff was a mechanic at one of defendant's shops. On April 12, 1985, defendant held a meeting at which plaintiff was present. The main focus of the meeting was defendant's reduction of operations, including closing some offices. Plaintiff, who did not agree with defendant's planned cutbacks, mailed a threatening letter to defendant following the meeting. The letter laid out numerous grievances and threatened, among other things, to report alleged violations to the [Department of Natural Resources (DNR)] and [Environmental Protection Agency] if defendant did not engage in discussions with plaintiff and his co-workers and consider giving certain laid off employees their jobs back.
>
> After defendant received the letter, it initially suspended defendant [sic]. A week later, on June 14, 1985, defendant recommended that the mechanic's position at plaintiff's shop be eliminated based on the proposed cutbacks in ownership of heavy equipment.
>
> On June 17, 1985, plaintiff filed a complaint with the Michigan Department of Public Health. Thereafter, plaintiff filed reports with the DNR and the Michigan Department of Labor.
>
> On July 31, 1985, plaintiff was notified that his position had been eliminated. Plaintiff then filed suit against his employer and his complaint included a retaliation claim under the WPA.
>
> The trial court concluded that plaintiff had not established a prima facie case of retaliation under the WPA because he could not establish a causal connection. The court explained that Plaintiff was aware of the planned scaling down of defendant's equipment operations for several months prior to his whistleblower activities and had been aware of the alleged problems at the shop for several years prior to notifying authorities. "Yet, Plaintiff did not exercise his civil duty by reporting these violations, as envisioned in the Act, until it became apparent that he

and others might lose their jobs due to circumstances unrelated to the violations." [*Wolcott*, 691 F Supp] at 1059.

The court noted that the WPA "was not intended to serve as a tool for extortion." Rather, the primary motivation of an employee availing himself of whistleblower protection must be a desire to inform the public on matters of public concern, not personal vindictiveness. *Id*. at 1065. It concluded that plaintiff "clearly did not have the public interest in mind while threatening to report defendant unless jobs at the [shop where plaintiff was employed] were forthcoming." *Id*.

The court concluded that if it countenanced plaintiff's conduct, it would encourage other employees to hold off blowing the whistle until it becomes most advantageous for them to do so. Plaintiff has offered no evidence which suggests that the Michigan legislature intended the [WPA] to be used as an offensive weapon by disgruntled employees and the Court therefore concluded that Plaintiff's WPA claim failed.

In *Shallal*, the plaintiff was an adoption department supervisor for defendant. About a year into his tenure, allegations arose that plaintiff's supervisor was drinking on the job and misusing agency funds. Plaintiff discussed the need to report her supervisor over the next year, but never took any action while employed with defendant. After an incident occurred in which plaintiff was criticized, via a written report from [the] Department of Social Services [DSS], for her inadequate actions relating to reports of abuse to child [sic] whose placement she supervised, plaintiff was called into her supervisor's office. The ensuing discussion became heated, and plaintiff threatened to report her supervisor's abuses of alcohol and agency funds if he failed to "straighten up." Nevertheless, Plaintiff was discharged based on the DSS report. Plaintiff never reported her supervisor, but rather, filed suit against Defendant asserting a retaliation claim under the WPA.

Citing *Wolcott* with approval, in *Shallal* the Michigan Supreme Court held that the "**primary motivation** of an employee pursuing a whistleblower claim 'must be a desire

to inform the public on matters of public concern, and not personal vindictiveness.' " *Shallal*, 455 Mich [at 621]. (Emphasis added). The court also cited with approval the following passage from [*Wolcott*]:

"Where, however, an employee . . . keeps the matter quiet for more than a year, eventually revealing it not [to] the appropriate authorities or even to others for the purpose of preventing public injury, but rather for some other limited and private purpose, however, [sic] laudable that purpose may appear to the employee, no such protection is afforded. [Otherwise] we would be discouraging disclosure and correction or [sic] unlawful or improper acts by encouraging employees to 'go along' and then keep quiet reserving comment or disclosure until a time best suited to the advancement of their own interests." [*Id.*]

The court concluded that, like *Wolcott*, plaintiff used her own situation to extort defendant not to fire her and that under the facts at hand, "no reasonable juror could conclude that plaintiff threatened to report [defendant] out an [sic] altruistic motive of protecting the public. Furthermore, it is clear that the decision to fire plaintiff was made before her threat to Quinn and that plaintiff knew of this decision as evidenced by her calendar entry." *Id.* Because plaintiff used the threat of reporting defendant to force him to allow her to keep her job, no reasonable juror could conclude there was a causal connection between her firing and the protected activity. "To hold otherwise 'would encourage other employees to hold off blowing the whistle until it becomes most advantageous for them to do so.' " *Id.* [at 622]. [*Robinson*, 624 F Supp 2d at 632-633.]

The *Robinson* court held that the plaintiff in that case, like the plaintiffs in *Wolcott* and *Shallal*, "was aware of the alleged violations for a considerable period of time, yet only threatened to report such violations to a public body when it was apparent that his job performance was being questioned." *Id.* at 634. The court continued:

Furthermore, like the situation seen in *Shallal* . . . , the evidence indicates that the challenged employment action [the defendant's decision to eliminate the plaintiff's position and transfer him to another office] had already been contemplated, *and that Plaintiff knew such actions were being contemplated,* before he made his threat . . . . In addition, Plaintiff made a *conditional threat* to report his allegations only if the criticisms of his work performance did not end. Finally, Plaintiff never made a report to the [Office of Federal Contracts Compliance Programs], or any other public body, even after he stopped working for Defendant.

Under these facts, a reasonable jury could not conclude that Plaintiff's "primary motivation" was a desire to inform the public. To allow Plaintiff's WPA claim to proceed under these facts would be to discourage disclosure by encouraging employees [to] hold off blowing the whistle, or threatening to do so, until it becomes most advantageous for them to do so. [*Id.*]

Unlike the plaintiffs in the above cases, plaintiff did not use the WPA as an offensive weapon or tool for extortion. The majority concludes that plaintiff acted in bad faith, in a manner similar to the plaintiff in *Shallal*, by withholding "his accusation of a legal violation until after he accumulated thousands of dollars' worth of sick and vacation time." I disagree. Plaintiff first informed Smiley of his disagreement with the payout policy in March 2003, immediately after the mayor issued the memorandum stating that there would be no payouts for unused vacation days. Although plaintiff did not make another formal complaint to Smiley until January 2004, when he requested a payout for his unused days in 2003 and identified the policy as a violation of Ordinance 68C, his actions cannot be considered extortion. In his January 23, 2004, letter to Hamilton, plaintiff explained that he was "in no position to take vacation time" in 2003 because of staffing changes that year and that the "ordinance was not re addressed in

regards to [vacation] benefits during the past year and the Mayor and council clearly had ample time to bring this up and I expected them to [do so] after the memo of March 03." Because Smiley and the city council failed to address the violation of Ordinance 68C as plaintiff expected they would, plaintiff requested a payout in January 2004. He was legally entitled to a payout for his unused days in 2003 under Ordinance 68C, and the ordinance itself stated that such payouts were to be made "in January in the year after which [the days] are accumulated." Thus, plaintiff waited to request a payout for his unused days until he was legally entitled to such payout, pursuant to the ordinance. In *Wolcott*, *Shallal*, and *Robinson*, the plaintiffs were aware of alleged violations of law by their employers for significant periods—up to several years—and only threatened to report those violations after their own job performances or positions came in jeopardy. The alleged violations of law they threatened to report were completely unrelated to the reasons their job performances or positions were jeopardized. Plaintiff's actions cannot be equated to the actions of the plaintiffs in those cases. There was no evidence of bad faith in this case.

Moreover, contrary to the majority's conclusion that "plaintiff was decidedly *not* acting in the public interest, but in the thoroughly personal and private interest of securing a monetary benefit," there was evidence that he acted, at least in part, in the public interest. Plaintiff, the city's police chief, stated in his January 9, 2004, letter to Smiley that ignoring the content of Ordinance 68C "would be a direct overt violation of that ordinance and I fully intend to address the violation should it occur." He reiterated the same at the January 12, 2004, staff meeting. In his January 15, 2004, letter to Lowthian, plaintiff stated: "I cannot allow them to violate the ordinance by 'forcing waivers' of ordinance[-]given rights. *I believe it is my job*

*as a police officer to point the violation out* and I will pursue it as far as it needs to go." (Emphasis added.) In his January 23, 2004, letter to Hamilton, plaintiff stated:

> My position is this, this is a violation of the ordinance [and] I told the mayor on the 12th it was an ordinance violation . . . . If I need to re address [the issue] through the council I will, if you have any input on resolving this I would appreciate it or I will be forced to pursue this as a violation of the law and will address it as such.

Given this evidence, plaintiff clearly intended to treat Smiley's payout policy as an ordinance violation and believed that it was his duty as an officer of the law to do so. The majority suggests that Smiley and his administration were acting in the public interest by withholding payouts, thereby counteracting a severe budgetary shortfall, and that plaintiff acted in opposition to that interest by requesting a payout under the ordinance. While I agree that it may be necessary for a city to adjust its budget to preserve essential public services and avoid terminating its employees, balancing the budget through violating one of its own ordinances hardly seems to serve the public interest. Rather than amending Ordinance 68C, the city's department heads reached a "gentlemen's agreement" that all vacation days had to be used within the calendar year, with no payouts for unused days. Thereafter, Smiley issued a memorandum of this agreement. But city attorney Dubay later advised the city that payouts had to be made because Ordinance 68C had not been amended to reflect the "gentlemen's agreement." According to Smiley's testimony, Dubay told him, "Chuck, you can't make a gentlemen's agreement to drive 55 [miles an hour] when the speed limit is posted at 45 . . . ." By stating that he would treat the payout policy issued by

Smiley as an ordinance violation, plaintiff was fulfilling his duty as police chief to uphold the law, which was certainly in the public interest.

In *Trepanier v Nat'l Amusements, Inc*, 250 Mich App 578, 580-581; 649 NW2d 754 (2002), the plaintiff requested a personal protection order (PPO) against one of his coworkers because of the coworker's harassment of him outside of work. After he was discharged, the plaintiff filed suit against the defendant employer, asserting that the defendant violated the WPA by discharging him, in part, because he sought a PPO against his coworker. *Id.* at 581-582. The trial court denied the defendant summary disposition of the plaintiff's WPA claim. *Id.* at 582. This Court affirmed, holding that the facts of the case were "clearly distinguishable" from those in *Shallal*. The Court stated, in part:

> Although plaintiff's decision in this case to obtain a PPO may have been motivated by personal reasons, plaintiff did not use his protected activity to extort his employer, as did the plaintiff in *Shallal*. Further, although plaintiff's primary purpose may have been to protect himself and his girlfriend from harassment, reasonable jurors could conclude that plaintiff was acting in the public's interest, in addition to his own. Assuming the truth of plaintiff's assertions, [the coworker's] threatening telephone calls could constitute aggravated stalking, a felony and a serious public safety issue. See MCL 750.411i. [*Id.* at 587-588.]

Similarly, in this case, although plaintiff had personal reasons for desiring Ordinance 68C to be enforced, i.e., his own financial status, a reasonable juror could have concluded that he also acted as an officer of the law attempting to have the ordinance enforced as written, which was in the public interest.[2] Plaintiff did not use

---

[2] Nowhere in the WPA does it state that a whistleblower must not have *any* selfish motives. The underlying purpose of whistleblower protection

the WPA as a tool to extort the city. Accordingly, I would hold that plaintiff was not barred from recovering under the WPA.

Because there was sufficient evidence to conclude that plaintiff engaged in a protected activity and that there was a causal connection between his protected activity and subsequent discharge, I would affirm the trial court's denial of defendants' motion for JNOV.

### III. DEFENDANTS' REMAINING ISSUES ON APPEAL

I will briefly address the two remaining issues raised by defendants on appeal.

#### A. JURY INSTRUCTIONS

Defendants argue that the trial court abused its discretion by denying their motion for a new trial, which was premised on the argument that the court improperly refused to give a jury instruction on improper motives of a whistleblower. I would disagree.

Rulings on motions for a new trial are reviewed for an abuse of discretion. *McManamon v Redford Charter Twp*, 273 Mich App 131, 138; 730 NW2d 757 (2006). " 'The determination whether a jury instruction is applicable and accurately states the law is within the discretion of the trial court.' " *Bordeaux v Celotex Corp*, 203 Mich App 158, 168-169; 511 NW2d 899 (1993) (citations omitted).

Jury instructions are examined as a whole. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). Instructions "should not omit material issues, defenses, or theories if the evidence supports them." *Id.*

---

laws is to encourage disclosure of, and to prevent against, violations of the law. In the federal analogue, a qui tam action specifically allows the whistleblower to receive a share of the recovery as his or her reward.

If an instruction is applicable to the case, accurately states the law, and was requested, the trial court must give it. MCR 2.516(D)(2); *Lewis v LeGrow*, 258 Mich App 175, 211; 670 NW2d 675 (2003).

The special jury instruction drafted by defense counsel and requested by defendants in this case stated:

> A plaintiff cannot recover under a whistleblower statute when the employee acts in bad faith. The primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern. An employee cannot keep a matter quiet and then eventually reveal it to others not for the purpose of preventing public injury, but rather for some limited or private purpose at a time best suited to the advancement of their [sic] own interests.

The instruction also cited *Wolcott* and *Shallal*.

The use note for the model civil jury instruction relating to the causation element of a WPA claim states that "[i]f there is an issue of improper motive in reporting or threatening to report a violation, an additional instruction *may* be required." M Civ JI 107.03 (emphasis added). The use of the word "may" indicates discretionary action. See *In re Humphrey Estate*, 141 Mich App 412, 422-423; 367 NW2d 873 (1985).

The special jury instruction requested by defendants did not apply to the facts of this case, nor did it find adequate support in *Wolcott* and *Shallal*. While the instruction's language was similar to the language in *Wolcott* and *Shallal*, the context of those cases was different. As explained above, there was no evidence of extortion, personal vindictiveness, or bad faith in this case, as there was in *Wolcott* and *Shallal*. Plaintiff did not use a threat of reporting the ordinance violation as an attempt to force Smiley to reappoint him. Rather, plaintiff acted to uphold the law. While plaintiff was also

motivated by his personal desire to be paid under Ordinance 68C, such a motive must not be considered *improper*, unless, as in *Shallal*, there truly is evidence of extortion, vindictiveness, or bad faith. It would be illogical to label a plaintiff's desire to be paid benefits to which he or she is legally entitled an *improper* motive.

Because no reasonable juror could have concluded that plaintiff had an improper motive for "blowing the whistle," the special instruction requested by defendants was inapplicable, and the trial court did not abuse its discretion by denying their motion for a new trial.

### B. SETOFF

Defendants also argue that the trial court erred by concluding that Smiley is not entitled to a setoff for the pension benefits paid to plaintiff by the city. I would disagree.

Whether defendants are entitled to a setoff is a question of law reviewed de novo on appeal. See *Markley v Oak Health Care Investors of Coldwater, Inc*, 255 Mich App 245, 249; 660 NW2d 344 (2003).

Defendants cite MCL 600.6303, which is inapplicable here because this is not a personal-injury action. Furthermore, I note that all the cases relied on by defendants are breach-of-contract cases. As such, the cases are inapposite. It is undisputed that plaintiff did not have an employment contract. Rather, a whistleblower claim is analogous to claims under antiretaliation provisions of other employment-discrimination statutes, such as statutes protecting handicapped persons from discrimination. *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 453; 750 NW2d 615 (2008).

Plaintiff relies on *Hamlin v Flint Charter Twp*, 165 F3d 426 (CA 6, 1999), and I find *Hamlin* persuasive. In

*Hamlin*, a handicapped-person discrimination case, the United States Court of Appeals for the Sixth Circuit held that, in general, pension payments from a collateral source should not be deducted from the damage award. *Id*. at 433-435. Because the victim, rather than the perpetrator, of discrimination should profit, payments from a collateral source should not be deducted from the award. *Id*. at 433-434. The court reasoned that "[a]pplying the collateral source rule in the employment discrimination context prevents the discriminatory employer from avoiding liability and experiencing a windfall, and also promotes the deterrence functions of discrimination statutes." *Id*. at 434.

Plaintiff argues that this Court should reverse the trial court's decision that the city is entitled to a setoff. But because plaintiff did not cross-appeal, such relief cannot be granted. See *Barnell v Taubman Co, Inc*, 203 Mich App 110, 123; 512 NW2d 13 (1993).

I would affirm the trial court's order awarding judgment to plaintiff.