WHITMAN v CITY OF BURTON (ON REMAND)

Docket No. 294703. Submitted June 5, 2013, at Lansing. Decided April 24, 2014, at 9:00 a.m. Vacated and remanded to Court of Appeals, 497 Mich ___.

Bruce Whitman brought an action in the Genesee Circuit Court against the city of Burton and the mayor of the city, Charles Smiley, alleging that defendants violated the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, when the mayor declined to reappoint plaintiff as police chief for the city in November 2007. Plaintiff alleged that he was not reappointed because, in early 2004, he had threatened to pursue criminal charges against the mayor if the city did not comply with a city ordinance and pay plaintiff for the unused sick, personal, and vacation leave time he had accumulated in 2003. Defendants maintained that plaintiff, along with other city administrators, had agreed to forgo any payout for accumulated leave in order to avoid a severe budgetary shortfall and that plaintiff was not reappointed because the mayor was dissatisfied with many aspects of plaintiff's performance as chief of police. A jury returned a verdict in favor of plaintiff. The court, Geoffrey L. Neithercut, J., entered a judgment consistent with the verdict and thereafter denied defendants' motion for judgment notwithstanding the verdict (JNOV) or a new trial. Defendants appealed. The Court of Appeals, O'CONNELL, P.J., and SAAD, J. (BECKERING, J., dissenting), reversed the circuit court's denial of defendants' motion for JNOV and remanded the case for further proceedings, concluding that plaintiff's claim was not actionable under the WPA because, in threatening to pursue criminal charges, plaintiff had acted to advance his own financial interests and not out of an altruistic motive of protecting the public. 293 Mich App 220 (2011). The Supreme Court granted plaintiff's application for leave to appeal, ordering the parties to brief whether *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604 (1997), correctly held that the primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern, as opposed to personal vindictiveness. 491 Mich 913 (2012). The Supreme Court then reversed the judgment of the Court of Appeals and remanded to the Court of Appeals, holding that the language of the WPA does not address an employee's primary motivation, nor does it imply or suggest that any motivation must be proved as a prerequisite to bringing a claim. The Court held that

*Shallal* did not hold that an employee's motivation is a factor in determining whether the employee engaged in protected activity and that, to the extent that *Shallal* has been interpreted as requiring a specific motive, any language to that effect must be disavowed as dicta. The Court held that plaintiff engaged in conduct protected under the WPA when he reported the mayor's violation of the ordinance to the mayor himself, a city administrator, and the city attorney. The Court stated that to recover under the WPA, plaintiff had to establish a causal connection between this protected conduct and the adverse employment decision by demonstrating that defendants took the adverse employment action because of plaintiff's protected activity. The Supreme Court stated that, because the Court of Appeals did not address the issue of causation when it held that plaintiff's WPA claim failed as a matter of law, the question had to be resolved on remand. The Court reversed and remanded the matter to the Court of Appeals "for consideration of all remaining issues on which that [C]ourt did not formally rule, including whether the causation element of MCL 15.362 has been met." 493 Mich 303 (2013).

On remand, the Court of Appeals *held*:

1. Because the WPA protects those who protect the public interest by blowing the whistle on illegality, and laws in general are an expression of public policy for the benefit of the public, there is typically no question that reporting a violation of law advances the public interest. But this is not always true, and is certainly not true in this matter. In this case, plaintiff's actions are unquestionably and objectively contrary to the public interest. Regardless of plaintiff's personal motivations, his whistleblowing effort sought enforcement of a law that harmed, not advanced, the public interest. The ordinance in question is not a law that protects the public interest, but rather an ordinance that reads much like a standard, garden-variety collective-bargaining provision for wages and benefits.

2. The administrative team's waiver of the perks contained in the ordinance was an illustration of shared sacrifice by the department heads to advance the public interest of the residents of Burton at their own expense.

3. When an ordinance, as here, is not an ordinance intended to protect the public interest, but rather is a simple listing of wages, benefits, and various perks—and the very public servants who benefit financially from the ordinance make a personal sacrifice and waive their right to these perks to save the public badly needed funds and to prevent layoffs and reduced public services—then any action

contrary to the waiver is contrary to the public interest. Waiver of the perks advances the public interest, opposition to that waiver harms the public interest.

4. Whistleblowing assumes that an employee takes a risk of retaliation for uncovering the public employer's misconduct. There was no misconduct or illegality in this case. This case involves an insistence by an employee on getting his perks, not an uncovering of corruption or illegality. The disagreement about the legal effects of the waiver was satisfied in plaintiff's favor. Accordingly, plaintiff's citation of the ordinance was not whistleblowing. The disagreement concerned the proper interpretation of the city's labor laws, whether the administrative team could waive the perks provided by the ordinance, and whether plaintiff was bound by the team's waiver. It has nothing to do with whistleblowing.

5. Plaintiff's actions, as an objective matter, were undoubtedly against the public interest.

6. The city did not violate any law in the sense that "violations of law" have been traditionally understood in whistleblowing lawsuits, i.e., revealing public corruption or malfeasance. The city simply refused to grant plaintiff a monetary perk that he demanded. Plaintiff may or may not have been entitled to his perks, but he most certainly is not entitled to claim the protection of the WPA when his conduct objectively serves his interest, but harms the public interest.

7. Because plaintiff is not a whistleblower under the WPA, no juror could legally find in favor of plaintiff on his WPA retaliation claim. The trial court's denial of defendant's motion for JNOV is reversed and the case is remanded to the trial court for further proceedings.

8. Plaintiff's alleged whistleblowing activity does not have a causal link to the mayor's decision to not reappoint plaintiff for the following four reasons. First, the mayor viewed plaintiff's complaints as presenting an issue of trust, not in the context of whistleblowing or anger at plaintiff's supposed whistleblowing. Second, there is an enormous temporal gap between plaintiff's alleged whistleblowing and the supposed retaliation, which belies any causal connection between the two. It strains credibility to the breaking point to suggest that the mayor, who had the power to dismiss plaintiff at any time and for any or no reason, was so upset with plaintiff's alleged whistleblowing in late 2003 and early 2004 that he allowed plaintiff to continue as police chief until late 2007 and only then decided to retaliate against plaintiff. Third, there were numerous breaks in the causal chain. Fourth, plaintiff provided no evidence to refute the mayor's stated and compelling reasons for not reappointing him—that plaintiff engaged in seri-

ous misconduct and misused his office. It is simply fanciful to suggest that a mayor, whose chief of police works at his pleasure, would make a reappointment decision on the basis of an old, stale issue instead of very recent, more disturbing revelations. The evidence is overwhelming that plaintiff's so-called whistleblowing had no connection to the mayor's decision to not reappoint plaintiff.

Reversed and remanded.

O'CONNELL, P.J., concurring, fully concurred with the majority opinion and wrote separately to state that plaintiff's breach of contract precludes him from maintaining this action under the WPA. If there is any causal connection between plaintiff's whistleblowing conduct and the decision not to reappoint him, plaintiff severed that connection by breaching the agreement to forgo wage benefits. To allow plaintiff to benefit from his breach is to ignore the substance and purpose of basic contract law and of the WPA.

BECKERING, J., dissenting, stated that the majority's holding that plaintiff is not a whistleblower under the WPA directly conflicts with the Supreme Court's conclusion that plaintiff engaged in protected activity under the WPA, which is the law of the case that the Court of Appeals must follow. The Supreme Court's conclusion that plaintiff engaged in protected activity under the WPA necessarily encompasses consideration of any issue that would be dispositive of whether plaintiff engaged in protected activity under the WPA. Assuming that plaintiff's actions must have objectively advanced the public interest to be protected under the WPA, this issue was necessary to the Supreme Court's determination that plaintiff engaged in protected activity under the WPA. The law of the case doctrine applies to questions actually decided in the prior decision and to those questions necessary to the court's prior determination. Nothing in the plain language of the WPA requires either that the law that is the subject of a report must objectively advance the public interest or that the employee's report must objectively advance the public interest. Application of the plain language of MCL 15.362 dictates that plaintiff is a whistleblower. It is undisputed that plaintiff falls into the category of whistleblowers that encompasses those who report, or are about to report, violations of laws, regulations, or rules to a public body. The majority's conclusion that plaintiff is not a whistleblower conflicts with the binding precedent of the Court of Appeals providing that if a plaintiff falls under one of the categories of whistleblowers under the WPA, the plaintiff is engaged in a protected activity for purposes of presenting a prima facie case. Even if plaintiff's actions must have objectively furthered the public interest for him to be a whistleblower under the WPA, this requirement is satisfied because the public

interest is served when a violation of the law by a public official is reported. Plaintiff's report to a public body of the mayor's violation of the ordinance was in the public's interest. Plaintiff is a whistleblower. There was sufficient evidence for a reasonable juror to conclude that plaintiff's reporting of the mayor's violation of the ordinance was a motivating factor in the mayor's decision not to reappoint plaintiff. None of the reasons offered by the majority to show the absence of a causal connection between the reporting of the ordinance violation and the decision not to reappoint plaintiff justifies the conclusion that there is no causal connection as a matter of law. While there was evidence that there may have been a variety of reasons for the mayor's decision not to reappoint plaintiff, there was ample evidence that plaintiff's reporting of the ordinance violation was a motivating factor for the adverse employment action. The trial court's denial of defendants' motion for JNOV should be affirmed because plaintiff engaged in protected activity and there was sufficient evidence of a causal connection between the protected activity and the decision not to reappoint plaintiff to create a question of fact for the jury.

*Tom R. Pabst, Michael A. Kowalko,* and *Jarrett M. Pabst* for plaintiff.

*Plunkett Cooney* (by *Ernest R. Bazzana*) for defendant.

ON REMAND

Before: O'CONNELL, P.J., and SAAD and BECKERING, JJ.

SAAD, J.

I. PLAINTIFF IS NOT ENTITLED TO WPA PROTECTION[1]

In this Whistleblowers' Protection Act (WPA)[2] claim,

---

[1] A trial court's ruling on a motion for judgment notwithstanding the verdict (JNOV) is reviewed de novo on appeal. *Garg v Macomb Co Community Mental Health Servs,* 472 Mich 263, 272; 696 NW2d 646 (2005). "When reviewing the denial of a motion for JNOV, the appellate court views the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party to determine if a party was entitled to judgment as a matter of law." *Genna v Jackson,* 286 Mich App 413, 417; 781 NW2d 124 (2009).

[2] MCL 15.361 *et seq.*

our 2011 opinion[3] reversed the jury award in plaintiff's favor. We held that the Michigan Supreme Court's decision in *Shallal v Catholic Social Servs of Wayne Co*[4] barred plaintiff from claiming protection under the WPA, because he admitted that his motivation for asserting entitlement to accumulated, unused sick-leave pay under a city ordinance was entirely personal and selfish.[5] We reasoned that, under *Shallal*, plaintiff's private motivations for asserting defendants' noncompliance with the city ordinance disqualified him from WPA protections, because he did not act as a "whistle-blower" under the meaning of the WPA.

The Michigan Supreme Court reversed, and "disavowed" what we thought was the principle articulated in *Shallal* on the relevance of plaintiff's private motivations.[6] Instead, it held that plaintiff's private motivations for "blowing the whistle" are irrelevant,[7] and stated that plaintiff's conduct constituted protected activity under the WPA.[8] What we and the Michigan Supreme Court did not address—and what we must now analyze[9]—is whether plaintiff's actions or conduct,

---

[3] *Whitman v City of Burton*, 293 Mich App 220; 810 NW2d 71 (2011).

[4] *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604; 566 NW2d 571 (1997).

[5] Specifically, plaintiff first voiced his opposition to the city ordinance at issue by stating that " '[m]y current life style revolves around these very things [i.e., additional payments] that have been negotiated for me . . . .' " See *Whitman*, 293 Mich App at 225.

[6] *Whitman v City of Burton*, 493 Mich 303, 306; 831 NW2d 223 (2013). A summary of the facts relevant to this opinion can be found in *Whitman*, 493 Mich at 306-311, and *Whitman*, 293 Mich App at 222-228.

[7] *Whitman*, 493 Mich at 306.

[8] *Id*. at 320.

[9] Our understanding of the Supreme Court's statement that plaintiff "engaged in conduct protected under the WPA," *id*., is that it is predicated on a narrow reading of the WPA: namely, one that only analyzes the relevancy of a plaintiff's personal motivations for "blowing

as an objective matter, must advance the public interest in order to entitle plaintiff to the protection of the WPA.[10] Because the WPA protects those who protect the public interest by blowing the whistle on illegality, and laws in general are an expression of public policy for the benefit of the public, there is typically no question that reporting a violation of law advances the public interest. But this is not always true, and is certainly not true here.

In this case, plaintiff's actions are unquestionably and objectively contrary to the public interest. That is, regardless of his personal motivations (now irrelevant), his "whistleblowing" effort sought enforcement of a law that harmed, not advanced, the public interest.

The law in question, Burton Ordinances 68-C, is not a law that protects the public interest, but rather an ordinance that reads much like a standard, garden-variety collective-bargaining provision for wages and benefits.[11] It is simply a recitation that sets forth the

the whistle." Our earlier, reversed opinion only addressed this discrete aspect of the WPA. Because we did not analyze the overriding issue in our earlier opinion—namely, whether the WPA only protects conduct that *objectively* advances the public interest—the Supreme Court did not address this issue on appeal. Because the Supreme Court instructed us to consider on remand "all remaining issues on which [we] did not formally rule," we will now discuss this aspect of the WPA. *Id.* at 321.

[10] Our Court has noted the distinction between an employee's personal motives for reporting legal violations and whether that reporting actually advanced the public interest. See *Phinney v Perlmutter*, 222 Mich App 513, 554; 564 NW2d 532 (1997) ("[i]n addition, whether plaintiff sought personal gain in making her reports, rather than the public good, is legally irrelevant and need not be addressed *except to note that the reporting of misconduct in an agency receiving public money is in the public interest*") (emphasis added). *Phinney*'s holdings on unrelated matters have likely been abrogated by *Garg*, 472 Mich at 290.

[11] See Burton Ordinances 68-25C, § 8(I) ("68-C"). As noted by the Supreme Court, Burton's ordinance numbering and policy regarding unused leave time have changed since the time of trial. *Whitman*, 493

wages and benefits for administrative, nonunionized employees of the city of Burton. Normally, an employee must use sick days or vacation days, or lose them. But under some collective-bargaining agreements and employment policies, employees may "accumulate" these days and then get paid for all such days not used. This perk is generally found in collective-bargaining agreements for unionized employees. But here, this benefit—along with a statement of wages and matters like dental insurance—were codified in 68-C.

The waiver of the benefits contained in 68-C—which plaintiff characterizes as a "violation of law"—has its origins in a severe financial crisis that afflicted the city of Burton in the earlier 2000s.[12] During this period, the city's department heads—who obviously benefited from 68-C—voted as a group, not only to take a wage freeze, but to forgo the perks contained in the ordinance to avoid harmful layoffs and reduced services to the public.[13] In other words, the administrative team's waiver of the perks contained in the ordinance was an illustration of shared sacrifice by the nonunionized department heads to advance the public interest of the residents of Burton at their own expense.[14]

Only one department head objected to this waiver of perks: plaintiff, who was then the chief of police.[15] He

---

Mich at 306, n 3. "Because those changes are not relevant to our analysis, this opinion refers to the ordinance numbering and language as it was introduced during trial." *Id.*

[12] *Whitman*, 293 Mich App at 224.

[13] *Whitman*, 493 Mich at 307.

[14] The dissent cynically refers to this action as a "cost-saving method in the guise of a 'gentleman's agreement.' "

[15] *Whitman*, 493 Mich at 307. It appears that plaintiff attended the March 2003 meeting when the department heads decided to waive the perks in 68-C, but it is unclear whether plaintiff voiced an opinion on the waiver at the meeting.

demanded his money as provided for in the ordinance,[16] which he received after the mayor acted on the advice of outside legal counsel. This is the "law" plaintiff uses to assert a claim under the WPA.

The WPA is designed to ferret out violations of the law that injure the public, especially when applied to public-sector defendants.[17] If government officials, who are bound to serve the public, violate laws designed to protect the public from corruption, pollution, and the like, then employees who, at their own risk, blow the whistle on such illegality necessarily serve the public interest—which is precisely why the WPA grants such employees protection from reprisal. Yet, where the ordinance in question, as here, is not an ordinance intended to protect the public, but rather is a simple listing of wages, benefits, and various perks—and the very public servants who benefit financially from the ordinance make a personal sacrifice and waive their right to these perks to save the public badly needed funds and to prevent layoffs and reduced public services—then any action contrary to the waiver is contrary to the public interest. Again: the waiver of the perks set forth in the ordinance at issue advances the public interest. Opposition to that waiver—on which plaintiff bases his suit—harms the public interest.

---

[16] *Id.*

[17] "[The WPA encourages employees to assist in law enforcement] with an eye toward promoting public health and safety. *The underlying purpose of the [WPA] is protection of the public.* The act meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law. Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses." *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378-379; 563 NW2d 23 (1997) (emphasis added).

In addition, whistleblowing assumes that an employee takes a risk of retaliation for uncovering the public employer's misconduct. Here, there simply was no misconduct or illegality. The only conduct of the city employees that implicated 68-C was the department heads' decision to waive the perks contained in the ordinance, and plaintiff's refusal to honor that waiver. This is an insistence by an employee, plain and simple, to get his perks—not an uncovering of corruption or illegality. And this disagreement about the legal effects of the waiver was satisfied, in plaintiff's favor, after the city sought legal counsel. Accordingly, plaintiff's citation of the ordinance was not whistleblowing. It simply involved a disagreement regarding the proper interpretation of the city's labor laws: whether the administrative team could waive the perks under 68-C, and whether plaintiff was bound by the group's waiver. It has nothing to do with whistleblowing whatsoever.

This is why this is not the usual case, where a report of a violation of law normally constitutes conduct in the public interest.[18] Here, to the contrary, plaintiff's actions—as an objective matter—were undoubtedly against the public interest. And the city did not actually "violate" any law in the sense that "violations of law"

_____

[18] Cases from our sister states interpreting their whistleblower statutes and jurisprudence recognize the distinction between reported legal violations that affect the public interest (which are protected) and reported legal violations that affect solely private interests (which are not). Though these cases involve internal corporate disputes—as opposed to reports of violated municipal ordinances—we think that the reasoning is equally relevant to this case, where the violated ordinance did not advance the public interest. See *Garrity v Overland Sheepskin Co of Taos*, 1996-NMSC-032, ¶ 18; 121 NM 710, 715; 917 P2d 1382 (1996) ("[w]hen an employee is discharged for whistleblowing, the employee must also demonstrate that his or her actions furthered the public interest rather than served primarily a private interest"), and *Darrow v Integris Health, Inc*, 2008 Okla 1, ¶ 16; 176 P3d 1204 (2008) ("to distinguish whistleblowing claims that would support a viable common-law tort claim from those that would not, the public policy breached must truly impact public rather than the employer's private or

have been traditionally understood in whistleblowing lawsuits—i.e., revealing public corruption or malfeasance. It simply refused (at first) to grant plaintiff a monetary perk that he demanded. Plaintiff may or may not have been entitled to his perks, but he most certainly is not entitled to claim the protection of the WPA, when his conduct objectively serves his interest, but harms the public's.

Because he is not a "whistleblower" under the WPA, no juror could legally find in favor of plaintiff on his WPA retaliation claim. The trial court's denial of defendants' request for JNOV is accordingly reversed.

## II. CAUSATION[19]

We also held in our earlier opinion that plaintiff's

---

simply proprietary interests"). Cases from foreign jurisdictions are not binding, but can be persuasive authority. *People v Campbell*, 289 Mich App 533, 535; 798 NW2d 514 (2010).

[19] To prevail under the WPA, plaintiff must "establish a causal connection between [the] protected conduct and the adverse employment decision by demonstrating that his employer took adverse employment action *because of* his protected activity." *Whitman*, 493 Mich at 320. In the absence of direct evidence of retaliation (which plaintiff does not present), he must present indirect evidence to "show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013). A plaintiff's presentation of indirect evidence is analyzed under "the burden-shifting framework set forth in *McDonnell Douglas [Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)]." *Id.* Applying this standard to retaliation claims, a plaintiff must show that his "protected activity" under the WPA was "one of the reasons *which made a difference* in determining whether or not to [discharge] the plaintiff." *Matras v Amoco Oil Co*, 424 Mich 675, 682; 385 NW2d 586 (1986) (emphasis added; quotation marks and citation omitted). In other words, " '[t]o establish causation, the plaintiff must show that his participation in [protected activity] was a "significant factor" in the employer's adverse employment action, not just that there was a causal link between the two.' " *Rymal v Baergen*, 262 Mich App 274, 303; 686 NW2d 241 (2004) (citation omitted). Because *Debano-Griffin* uses the *McDonnell Douglas* framework, originally designed for employment-discrimination

alleged whistleblower activity from late 2003 to early 2004 was not the legal cause of the mayor's decision to not reappoint plaintiff as police chief in late 2007.[20] Upon closer examination of the facts pertinent to the causation issue, we are even more convinced that plaintiff's alleged whistleblower activity lacks a causal link to the mayor's decision. We so hold for several reasons.

### A. TRUST, NOT WHISTLEBLOWING

As noted, in 2003, the mayor's administrative team voted to voluntarily take a wage freeze and forgo the perk of payment for accumulated sick days to save taxpayers' money and avoid layoffs and reduced services.[21] This sacrifice spoke well of the mayor and his department heads. Plaintiff's refusal to abide by the department heads' agreement, and subject himself to the same sacrifice, raised issues of trust and caused the mayor to rightly be disappointed in plaintiff. Indeed, plaintiff's "evidence" of a causal connection between his "whistleblowing" and the mayor's decision to not reappoint him, many years later, frames the issue in exactly this context.

A third party who attended plaintiff's June 2004 meeting with the mayor made handwritten notes of the discussion, which state: " 'Mayor = No Trust—68-C (vacation)—lack of communication[.]' "[22] And the mayor's alleged December 2007 statement to other senior police officers that he and plaintiff " 'got off on the

---

claims, it is appropriate for the Court to use federal cases interpreting *McDonnell Douglas* as persuasive authority. See *Radtke v Everett*, 442 Mich 368, 382; 501 NW2d 155 (1993) (stating that Michigan courts " 'turn to federal precedent for guidance in reaching [their] decision' " on whether a plaintiff has established a valid discrimination claim) (citation omitted).

[20] *Whitman*, 293 Mich App at 232, n 1.

[21] *Id.* at 230.

[22] *Whitman*, 493 Mich at 309.

wrong foot' "[23]—a statement that, if made, occurred *after* the mayor decided not to reappoint plaintiff[24]—supposedly showed that he considered plaintiff's 68-C complaints as presenting an issue of trust, in that plaintiff's failure to adhere to a voluntary agreement with his colleagues showed a betrayal of trust. In sum, it appears the mayor viewed the 68-C issue not in the context of whistleblowing, or anger at plaintiff's supposed whistleblowing, but instead as presenting an example of how plaintiff was untrustworthy. As noted, this is not a case where a "violation of law" was even remotely an issue. And it is, at best, extremely unlikely that even this "lack of trust" over plaintiff's failure to honor an agreement on this specific occasion had anything to do with the subsequent decision to not reappoint him, for the numerous reasons discussed later in this opinion.

B. THE ALLEGED RETALIATION IS TEMPORALLY REMOTE FROM
   ALLEGED WHISTLEBLOWING

Plaintiff's claim has a serious temporal problem: he alleges that he was not reappointed in late 2007 for events that took place in late 2003 and early 2004. Our courts have taken pains to stress that the length of time between an alleged whistleblowing and an adverse employment action is not dispositive of retaliation—when those two events are *close in time* (i.e., days, weeks, or a few months apart).[25] If whistleblowing and

---

[23] *Id.*

[24] It is difficult to see how a statement the mayor allegedly made *after* he had already declined to reappoint plaintiff would influence his decision not to reappoint him.

[25] See, for example, *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003) (to satisfy causation requirement under the WPA, a plaintiff must show "something more than merely a coincidence in time between protected activity and adverse employment action"); *Tuttle v*

retaliation that occur close in time are not sufficient to find causation under the WPA, whistleblowing and retaliation that occur *far apart* in time are certainly not sufficient to support causation—and, in fact, weigh against finding causation. See *Fuhr v Hazel Park Sch Dist*, 710 F3d 668, 675-676 (CA 6, 2013) (holding in the context of a Title VII retaliation claim that a two-year gap between the plaintiff's protected activity and the claimed retaliatory act "proves fatal to [plaintiff's] assertion that there is a causal connection").[26]

Here, there is an enormous temporal gap between plaintiff's alleged whistleblowing and the supposed re-taliation, which belies any causal connection between the two. As noted, plaintiff's demands to receive com-pensation under 68-C took place in 2003 and early 2004. The mayor declined to reappoint him police chief in November 2007—almost four years after the supposed whistleblowing. Of course, the mayor, as the top execu-

---

*Metro Gov't of Nashville & Davidson Co, Tenn*, 474 F3d 307, 321 (CA 6, 2007) ("[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim"); *Shaw v Ecorse*, 283 Mich App 1, 15; 770 NW2d 31 (2009) ("[a] temporal connection between protected activity and an adverse employment action does not, in and of itself, establish a casual connection").

[26] In its opinion, the United States Court of Appeals for the Sixth Circuit noted that "[o]ur review of the law shows that multiyear gaps between the protected conduct and the first retaliatory act have been insufficient to establish the requisite causal connection." *Fuhr*, 710 F3d at 676. This observation is correct; interpretations of our sister states' whistleblower laws and jurisprudence have made similar observations on how a long time span between the alleged whistleblowing and supposed retaliation weigh against finding causation. See *Blake v United American Ins Co*, 37 F Supp 2d 997, 1002 (SD Ohio, 1998) (holding that alleged whistleblowing action that took place five years before the plaintiff's termination was not "close enough in time . . . to support a claim of retaliation"); *Anderson v Meyer Broadcasting Co*, 2001 ND 125, ¶ 35; 630 NW2d 46 (2001) (holding that a "lengthy" delay of approximately a year "between [plaintiff's] reports and her termination does not support an inference she was fired because of the protected activity").

tive officer of the city of Burton, *could terminate plaintiff at any time*.[27] He could have done so in March 2003, when plaintiff first voiced opposition to the waiver of 68-C, or in early 2004, when plaintiff insisted on his compensation pursuant to the ordinance. In fact, the evidence demonstrates that the mayor was not concerned about plaintiff's 68-C demands at all: he reappointed plaintiff as police chief in November 2003—six months after plaintiff's initial complaint regarding 68-C. And, again, the expiration of plaintiff's term took place in November 2007, almost *four years* after those complaints. It strains credulity to the breaking point to suggest, as plaintiff and the dissent do, that the mayor—who had the power to dismiss plaintiff at any time, for any reason or no reason—was so upset with plaintiff's alleged "whistleblowing" in late 2003 and early 2004 that he allowed plaintiff to continue as police chief for all of 2004, 2005, 2006, and into late 2007, and only then decided to "retaliate" against plaintiff. Indeed, when viewed in the context of the typically close working relationship between a mayor and a chief of police, and the fact that in Burton the chief of police, as a member of the mayor's executive team, serves at the *pleasure of the mayor*, plaintiff's allegations take leave of reality and enter the theatre of the absurd.

### C. BREAKS IN PLAINTIFF'S SUPPOSED CAUSAL CHAIN

The long period of time between plaintiff's supposed whistleblowing and the mayor's decision not to reappoint him involves another aspect that is fatal to plaintiff's claim: numerous breaks in the causal chain. Plaintiff's first complaints regarding the administrative team's waiver of 68-C perks in March 2003 clearly did not cause the mayor to retaliate. Indeed, the mayor

---

[27] Burton Ordinances 6.2(b) states that the chief of police serves "at the pleasure of the Mayor."

reappointed him chief of police in November of that same year. His further attempts to secure compensation in January 2004 were addressed by the mayor—who sought the advice of city counsel and then outside labor counsel and complied with that legal advice by paying him almost $7,000 in additional compensation. And his 2004 dispute with the mayor ended amicably—he remained chief of police for over three years following that meeting, and, by his own admission, plaintiff never heard any mention of the 68-C dispute from the mayor and was not retaliated against during that time. These intervening events—all positive developments for plaintiff—raise serious doubts that his 68-C whistleblowing was a "determining factor" or " 'caus[e] in fact' " of the mayor's decision to not reappoint him. *Matras v Amoco Oil Co*, 424 Mich 675, 682; 385 NW2d 586 (1986) (citation omitted).

### D. PLAINTIFF'S MISCONDUCT LED TO ADVERSE EMPLOYMENT ACTION

In any event, plaintiff has provided no evidence to refute the mayor's stated and compelling reasons for not reappointing him: plaintiff engaged in serious misconduct and misused his office. After his reelection in November 2007, the mayor reevaluated his entire administrative team. During this period, he was advised of allegations of plaintiff's serious misconduct in office by officers in plaintiff's department. Among other things, these included allegations that plaintiff: (1) meted out inadequate discipline to subordinates who abused their power, (2) misused a city computer to exchange sexually explicit e-mail messages with a woman who is not his wife, (3) discriminated against a female officer, and (4)

forged a signature on a budget memo.[28] Command officers within the police department warned the mayor of serious morale problems created by plaintiff's abuse of power.[29] In the face of these troubling revelations, the mayor understandably did not reappoint plaintiff to this important position of public trust—and these are the reasons the mayor gave for declining to reappoint plaintiff as police chief in November 2007. To suggest that a mayor, whose chief of police works at his pleasure, would make a reappointment decision on the basis of an old, stale issue instead of very recent, more disturbing revelations, is simply fanciful.

Plaintiff made no specific effort before this Court to deny these allegations against him, other than to state, self-servingly and without support, that they are "merely a pretext," and to assert "that his personnel file demonstrates that his performance as a police chief was good, that he had received numerous awards, and that there were never any disciplinary actions against him."[30] His only proffered "evidence" of a causal connection between his supposed "whistleblowing" and the mayor's decision to not reappoint him is the aforementioned statement made by the mayor in December 2007—after the mayor already made his decision, but before its public announcement—in which the mayor supposedly told senior police officers that he lacked trust in plaintiff and cited as one example plaintiff's refusal to keep his word, along with the entire administrative team, and waive his unused sick-day compensation under 68-C.

---

[28] See *Whitman*, 493 Mich at 309. Plaintiff admitted at trial that he used a city computer to exchange sexually explicit messages with a woman who is not his wife. Plaintiff makes no specific effort to deny the other allegations, but states that they are "merely a pretext." *Id*. at 310.

[29] *Whitman*, 293 Mich App at 227.

[30] *Whitman*, 493 Mich at 309-310.

When this assertion is weighed against the other factors in this case—(1) the mayor's view of plaintiff's 68-C demands as a trust, not retaliation, (and certainly not "whistleblowing") issue, (2) the almost four-year interval between plaintiff's alleged whistleblowing and the purported retaliation, (3) the causal breaks in plaintiff's claim, and (4) allegations of plaintiff's extensive misconduct—the evidence is overwhelming that plaintiff's so-called "whistleblowing" had no connection to the mayor's decision to not reappoint him as police chief. There is simply no way that a reasonable factfinder, even when viewing the evidence and all legitimate inferences in the light most favorable to the nonmoving party, could find that retaliation was " 'one of the reasons *which made a difference* in determining whether or not to [reappoint] the plaintiff.' " *Matras*, 424 Mich at 682 (emphasis added; citation omitted).

### III. REPLY TO THE DISSENT

#### A. INTRODUCTION

While we respect and join in the dissent's insistence on adhering to the strict letter of the law, we strongly disagree with the dissent's interpretations and conclusions. In our judgment, the dissent ignores the reality that plaintiff's conduct has nothing to do with "whistleblowing" in the sense envisioned by MCL 15.361 *et seq.* Indeed, plaintiff's conduct represents the antithesis of the WPA's purpose.

As an objective reality, plaintiff's conduct harmed, not helped, the public interest, just the opposite of what the WPA was intended to do. Any observer of the economic crisis must conclude that the administrative team's waiver of the benefits contained in 68-C advanced the interest of the taxpayers in the financially

distressed city of Burton. It is not possible to both accept this reality and yet conclude that one who opposed the waiver and demanded his perk somehow serves the public interest—the two concepts are polar opposites of one another. To do so turns the WPA and reality upside down, and makes a mockery of the law and the context in which this case arises.

The same lack of realism permeates the dissent's causation analysis. Despite the fact that in the city of Burton, as in most cities, the chief of police, by law, serves "at the pleasure" of the mayor, the dissent suspends common sense and actually claims that the mayor, who was upset with what he regarded as plaintiff's untrustworthiness in 2003 and 2004, would wait almost four full years before not reappointing plaintiff because of these old disputes. Reaching this conclusion ignores the reality that the mayor reappointed plaintiff in 2003, after this disagreement surfaced, and worked closely with him for almost four subsequent years. It also ignores the admission of plaintiff himself that the mayor never retaliated against him after the 2004 disagreement, and that even after heated words in June 2004, they patched up their differences and worked together for almost four years without any incident. And it ignores numerous revelations of alleged serious misconduct that the mayor learned of in November 2007—the month that the mayor decided not to reappoint plaintiff.

What is the evidence that a stale, minor incident from early 2004 allegedly loomed so large after all these years in late 2007? Not any direct evidence, and indeed no evidence of any kind, oral or written, that this was even a factor at the time the mayor made his decision. Rather, we are supposed to believe that during a discussion by the mayor with the commanders of the police

department—a discussion that took place after the decision was made, but before the public announcement of the appointment of a new chief—comments were made that trust is an important quality in a chief and that the chief and the mayor had got off on the wrong foot because of a lack of trust in 2003 and 2004.

This is a fact, but a fact that has nothing to do with "whistleblowing," and nothing to do with the reasons for nonreappointment. It is a fact of life that when an entire administrative team shares in financial sacrifice in times of economic crisis, and one key member of that team either backs out of the agreement or breaks ranks with those who make the sacrifice, that there will be issues of trust and disappointment. But to elevate this incident to be the cause of a nonreappointment four years later, in the face of new revelations of alleged serious misconduct and the reality that the chief serves at the pleasure of the mayor, simply defies logic, common sense, and the reality of city management.

### B. LAW OF THE CASE AND OBJECTIVE ADVANCEMENT OF THE PUBLIC INTEREST

We and the dissent both cite the law of the case doctrine, but disagree on the interpretation of the Supreme Court's remand instructions.

As we noted, there is a distinction between a plaintiff's private motivations (now irrelevant) for reporting a violation of the law and the more fundamental question of whether the alleged reporting objectively advances the public interest. Though the Supreme Court addressed (and disavowed) the former analysis in its opinion, it said nothing and thus obviously did not rule on the latter, nor did we in our reversed opinion. Because the Supreme Court instructed us to address "all remaining issues on which [we] did not formally

rule,"[31] we see it as a correct application of the law of
the case for our opinion to analyze whether plaintiff's
conduct objectively advances the public interest, and
thus determine whether he is entitled to the protections
of the WPA. Such analysis, heretofore unaddressed, is
essential because the WPA, at its core, is intended to
advance the public interest by protecting individuals
who report violations of law, where those violations of
law harm the public interest.[32] Had the Michigan Su-
preme Court ruled on this important issue, we think it
would have analyzed the matter as our holding does,
because there are rare instances where reporting a
violation of the law will not advance or harm the public
interest.

We fundamentally disagree with the dissent's asser-
tion that reporting a violation of *any* law advances the
public interest, because this observation is inaccurate
and ignores the reality of this case. In rare instances—
such as this one—reporting violation of a law will not
advance the public interest, and will in fact be contrary
to the public interest.[33] Again, the law in question, 68-C,

---

[31] *Whitman*, 493 Mich at 321.

[32] See *Dolan*, 454 Mich at 378-379.

[33] See, for example, MCL 287.277 (mandating that upon receiving
notice of the presence of unlicensed dogs in the county from the county
treasurer, the prosecuting attorney "shall at once commence the neces-
sary proceedings against the owner[s] of the dog[s]"); MCL 750.542
(barring bands from playing the national anthem "as a part or selection
of a medley of any kind" or with any "embellishments of national or other
melodies" and the anthem's use "for dancing or as an exit march"); and
MCL 750.102 (stating that "[a]ny person who shall wilfully blaspheme
the holy name of God, by cursing or contumeliously reproaching God" is
guilty of a misdemeanor).

We cite these examples not to mock these laws or the sentiments they
express, but to demonstrate that not all individuals who report violations of
laws are whistleblowers, because reporting a violation of law in and of itself
does not always objectively advance the public interest. For instance, many

involved a monetary perk for a small number of senior administrative personnel. When Burton faced a financial crisis, the city's department heads admirably tried to advance the public interest by refusing to accept this perk—in other words, by waiving the financial benefits of the ordinance—benefits which were theirs to waive. And it is his disagreement with the waiver of this perk by which plaintiff claims his whistleblower status— disagreement with an ordinance that, if enforced (as it was with regard to him), benefited only plaintiff, and actually harmed the broader public.

For these reasons, we disagree with the dissent's observations on the law of the case, and think that we have an obligation, under the WPA, to hold that not all reports of legal violations are whistleblowing, because not all reports of legal violations objectively advance the public interest.

### C. CAUSATION

We also take issue with the dissent's causation analysis because it again ignores the reality of this public-sector setting.

---

dog-owning Michiganders do not get licenses for their pets. Under the dissent's definition of "whistleblowing" and interpretation of the WPA, an individual who complains that the local prosecuting attorney is not enforcing MCL 287.277 because he is not "commenc[ing] the necessary proceedings against" the owners of "all unlicensed dogs" is a "whistleblower" worthy of WPA protections—that individual has reported a violation of the law and is hence a whistleblower. We think such a result would be absurd because it plainly does not advance the public interest, which, as noted, is the WPA's raison d'être. See *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 675; 760 NW2d 565 (2008) ("[t]herefore, to paraphrase Justice MARKMAN in *Cameron* [*v Auto Club Ins Ass'n*, 476 Mich 55, 80; 718 NW2d 784 (2006)], a statute need not be applied literally if no reasonable lawmaker could have conceived of the ensuing result"). Again: not all individuals who report violations of law are whistleblowers worthy of WPA protection, because enforcement of some laws can be detrimental to the public interest. The fact that these instances are rare does not make this distinction any less vital.

Plaintiff admitted at trial that he used a city computer to exchange sexually explicit e-mails with a woman who is not his wife, which violated city policy. In addition, as noted, the trial court heard extensive testimony that plaintiff allegedly (1) meted out inadequate discipline to subordinates who abused their power, (2) discriminated against a female officer, and (3) forged a signature on a budget memo. Again, plaintiff makes no specific effort to deny these allegations against him, other than to state that they were "merely a pretext" to not reappoint him and provide a recitation of awards and positive performance reviews.

These stated reasons for declining to reappoint plaintiff, of which the mayor learned in November 2007, undermine plaintiff's claim that he was not reappointed for whistleblowing when two additional factors are added as context. As noted, the mayor could terminate plaintiff's employment at any time. Despite plaintiff's consistent demands that he receive compensation under 68-C in 2003 and 2004 (which he did) the mayor only declined to reappoint him in late 2007—again, an almost four year gap between the alleged whistleblowing activity and the adverse employment action.

The dissent wrongly implies that we give this temporal gap undue weight in our analysis and that it is the sole factor motivating our holding. Rather, the temporal gap is of enormous importance when viewed in conjunction with the other aspects of this case, namely: (1) the mayor's ability to terminate plaintiff's employment at any time, (2) the numerous other, valid reasons the mayor gave to not reappoint plaintiff, and (3) the fact that the mayor did not reappoint plaintiff almost *immediately* after learning about these numerous, other valid reasons in late 2007.

The ultimate problem with the dissent's analysis of causation is that it ignores this context. Its would-be holding is based on a supposedly acrimonious 2004 meeting (which took place well over three years before the adverse employment action, and which, by plaintiff's own account, ended amicably), and an alleged statement made by the mayor in December 2007 (after he had decided to not reappoint plaintiff) that mentioned plaintiff's demands for additional compensation under 68-C in the context of not trusting plaintiff to keep his word. As noted, when these assertions are weighed against the other factors in this case, there is simply no way that a reasonable fact-finder could conclude that retaliation was " 'one of the reasons *which made a difference* in determining whether or not to [reappoint] the plaintiff.' " *Matras*, 424 Mich at 682 (emphasis added; citation omitted).

### IV. CONCLUSION

Because no reasonable fact-finder could legally find in favor of plaintiff on his claim under the WPA, we reverse the trial court's denial of defendants' motion for JNOV and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

O'CONNELL, P.J. (*concurring*). I concur fully with Judge SAAD's majority opinion. I write separately to urge our Supreme Court to grant leave to appeal in the event of an application for leave to appeal and to consider the whistleblower claim in the context of plaintiff's breach of the agreement to forgo wage benefits. The record establishes that plaintiff attended the meeting at which city administrators agreed to forgo wage benefits. By doing so, plaintiff bound himself to a contractual agreement, which he later breached by

demanding the forgone benefits. In my view, if there is any causal connection between plaintiff's whistleblower conduct and the decision not to reappoint him, plaintiff severed that connection by breaching the agreement to forgo wage benefits. To allow plaintiff to benefit from his breach is to ignore the substance and purpose of basic contract law and of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*.

In contract law, "[o]ne who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." *Sentry Ins v Lardner Elevator Co*, 153 Mich App 317, 323; 395 NW2d 31 (1986). In this case, plaintiff and his similarly situated colleagues reached an agreement with defendants to forgo certain benefits. This agreement clearly benefitted the city and all of its residents, including plaintiff in his capacity as a resident of the city of Burton. Plaintiff then breached the agreement by demanding the forgone benefits. Plaintiff now attempts to benefit from his breach by conjuring an action under the WPA.

In my opinion, plaintiff's breach of contract precludes him from maintaining this specious action under the WPA.

Beckering, J. (*dissenting*). I respectfully dissent. The appeal of defendants, the city of Burton and former mayor Charles Smiley, returns to this Court from the Michigan Supreme Court after the Supreme Court held that plaintiff, Bruce Whitman, engaged in conduct protected under the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq*., and remanded to this Court to consider all remaining issues on which this Court did not formally rule, including the issue of causation. *Whitman v City of Burton*, 493 Mich 303, 319-321; 831

NW2d 223 (2013). On remand, the majority concludes that plaintiff is not a "whistleblower" under the WPA and that there was insufficient evidence at trial of causation to withstand defendants' motion for judgment notwithstanding the verdict (JNOV). I disagree and would affirm the trial court's denial of defendants' motion for JNOV.

### I. PROTECTED ACTIVITY

When this case was appealed to the Michigan Supreme Court, the Court held that plaintiff engaged in protected activity under the WPA:

> [I]t is undisputed that the Mayor decided to withhold payment of unused sick, personal, and vacation time in violation of Ordinance 68C, a decision to which Whitman objected. It is also undisputed that Whitman reported the Mayor's violation of Ordinance 68C to the Mayor himself, city administrator [Dennis] Lowthian, and the city attorney, and that following Whitman's reporting of this violation, he was discharged. Finally, Whitman did not knowingly make a false report given that the evidence reveals that the Mayor did in fact violate Ordinance 68C, nor is there any indication that a public body requested that Whitman participate in an investigation. *Accordingly, Whitman engaged in conduct protected under the WPA.* [*Whitman,* 493 Mich at 319-320 (emphasis added).]

Despite our Supreme Court's conclusion, the majority holds that plaintiff "is not a 'whistleblower' under the WPA . . . ." The majority reaches this conclusion by finding that "plaintiff's actions—as an objective matter—were undoubtedly against the public interest" because Ordinance 68C "harmed, not advanced, the public interest."[1] Aside from the fact that defendants did not

---

[1]  To the extent that the majority argues that plaintiff's reporting of the ordinance violation was not whistleblowing because the issue at hand

raise this as an argument—it is instead the brainchild
of the majority on remand—the majority's holding is
erroneous for several reasons.

First, our Supreme Court's express conclusion that
plaintiff engaged in protected activity under the WPA is
the law of the case; this Court is bound by this conclu-
sion. See *Lenawee Co v Wagley*, 301 Mich App 134, 149;
836 NW2d 193 (2013) ("The law of the case doctrine
holds that a ruling by an appellate court on a particular
issue binds the appellate court and all lower tribunals
with respect to that issue.") (quotation marks and
citations omitted). The majority's holding that plaintiff
is not a whistleblower under the WPA directly conflicts
with the Supreme Court's conclusion that plaintiff
engaged in protected activity under the WPA. See,
generally, *Henry v Detroit*, 234 Mich App 405, 409-410;

"simply involved a disagreement regarding the proper interpretation of
the city's labor laws," the majority ignores the evidence in this case. It
was clear to all parties that plaintiff was pursuing the ordinance violation
as a violation of the law. As noted in my previous dissent, on January 9,
2004, plaintiff sent a letter to Smiley indicating that "[t]o ignore issues
specified in that ordinance would be a *direct overt violation of that
ordinance* and I fully intend to address the *violation* should it occur."
(Emphasis added.) In his January 15, 2004 letter to Dennis Lowthian, an
administrative officer for the city who had been acting as a spokesperson
for all of the administrative officers, plaintiff stated: "I cannot allow them
to violate the ordinance by 'forcing waivers' of ordinance[-]given rights.
*I believe it is my job as a police officer to point the violation out* and I will
pursue it as far as it needs to go." (Emphasis added.) In his January 23,
2004, letter to city attorney Richard Hamilton, plaintiff made clear as
well: "My position is this, *this is a violation of the ordinance [and] I told
the mayor on the 12th it was an ordinance violation* . . . . I will be forced
to pursue this as a *violation of the law and will address it as such.*"
(Emphasis added.) Smiley himself testified that when he conferred with
the city's labor and employment attorney, Dennis Dubay, about the issue,
Dubay said, "Chuck, you can't make a gentlemen's agreement to drive 55
[miles per hour] when the speed limit is posted at 45 . . . ." The parties
were not debating "the proper interpretation" of labor laws; they were at
odds over whether Ordinance 68C should be enforced.

594 NW2d 107 (1999) (stating that a person who engages in "protected activity" under the WPA is a "whistleblower"); see also *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 379 n 10; 563 NW2d 23 (1997) (identifying various types of whistleblowers).

The majority attempts to sidestep the law of the case doctrine, opining that the Supreme Court remanded for consideration of " 'all remaining issues on which [the Court of Appeals] did not formally rule' " and that this Court did not previously consider whether plaintiff's actions must have objectively advanced the public interest to be protected under the WPA. However, "[t]he law of the case doctrine applies . . . to questions actually decided in the prior decision *and to those questions necessary to the court's prior determination.*" *City of Kalamazoo v Dep't of Corrections (After Remand)*, 229 Mich App 132, 135; 580 NW2d 475 (1998) (emphasis added). Although neither this Court in its prior opinion nor our Supreme Court addressed whether plaintiff's actions must have objectively advanced the public interest to be protected under the WPA, the Supreme Court's conclusion that plaintiff engaged in protected activity under the WPA necessarily encompasses consideration of any issue that would be dispositive of whether plaintiff engaged in protected activity under the WPA. Assuming that plaintiff's actions must have objectively advanced the public interest to be protected under the WPA, this issue was necessary to the Supreme Court's determination that plaintiff engaged in protected activity under the WPA.

Second, the majority's conclusion is contrary to the plain language of the WPA. As our Supreme Court emphasized, "the plain language of MCL 15.362 controls" in this case. *Whitman*, 493 Mich at 321. Nothing

in the plain language of MCL 15.362 can be taken as a requirement that the law that is the subject of a report must objectively advance the public interest. Further, nothing in its plain language provides that the employee's report must objectively advance the public interest. MCL 15.362 provides as follows:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Neither the terms "public interest" nor any like terms are found in the statute. "It is a well-established rule of statutory construction that this Court will not read words into a statute." *Byker v Mannes*, 465 Mich 637, 646-647; 641 NW2d 210 (2002). "If the statutory language is clear and unambiguous, appellate courts presume that the Legislature intended the meaning plainly expressed, and *further judicial construction is not permitted*." *McElhaney v Harper-Hutzel Hosp*, 269 Mich App 488, 493; 711 NW2d 795 (2006)(emphasis added).

As the basis for its holding that plaintiff's actions must have objectively furthered the public interest for plaintiff to be a whistleblower, the majority explains that the purpose of the WPA is the protection of the public. Although the majority correctly identifies the underlying purpose of the WPA, see *Dolan*, 454 Mich at 378-379, " 'the proper role of a court is simply to *apply* the terms of the statute to the circumstances in a

particular case.' " *People v McIntire*, 461 Mich 147, 153; 599 NW2d 102 (1999) (citation omitted). Here, application of the plain language of MCL 15.362 dictates that plaintiff is a whistleblower; the majority reads words into MCL 15.362 to reach a result that they believe is more consistent with the purpose of the WPA.

Third, the majority's conclusion is contrary to binding precedent. This Court has explained that "[t]he plain language of the [WPA] provides protection for two types of 'whistleblowers': (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action."[2] *Henry*, 234 Mich App at 409. "If a plaintiff falls under either category, then that plaintiff is engaged in a 'protected activity' for

---

[2] Without referring to any previous interpretations of the WPA, our Supreme Court in *Whitman* stated that "MCL 15.362 makes plain that *protected conduct does not include* reports made by an employee that the employee knows are false, *or reports given because the employee is requested to participate in an investigation by a public body*." *Whitman*, 493 Mich at 313 (emphasis added), see also *id.* at 320 ("nor is there any indication that a public body requested that Whitman participate in an investigation"). This interpretation of MCL 15.362 by the Supreme Court is contrary to previous interpretations of the statute by both the Supreme Court and this Court. See *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 399; 572 NW2d 210 (1998), *Anzaldua v Neogen Corp*, 292 Mich App 626, 630; 808 NW2d 804 (2011), *Truel v Dearborn*, 291 Mich App 125, 138-139; 804 NW2d 744 (2010), *Shaw v Ecorse*, 283 Mich App 1, 10-11; 770 NW2d 31 (2009), *Ernsting v Ave Maria College*, 274 Mich App 506, 510; 736 NW2d 574 (2007), *Manzo v Petrella and Petrella & Associates, PC*, 261 Mich App 705, 712-713; 683 NW2d 699 (2004), *Trepanier v Nat'l Amusements, Inc*, 250 Mich App 578, 583; 649 NW2d 754 (2002), and *Henry*, 234 Mich App at 410-411. I believe this to be an inadvertent misstatement of the law, because it was not relevant to the analysis in *Whitman*. I urge the Supreme Court to clarify whether a proper interpretation of MCL 15.362 includes as protected activity a person's participation in an investigation as requested by a public body, including reports given in the process.

purposes of presenting a prima facie case." *Id.* at 410. It is undisputed that plaintiff falls into the first category of "whistleblowers." The majority's conclusion that plaintiff is not a whistleblower conflicts with this Court's interpretation of the WPA.

Finally, even if plaintiff's actions must have objectively furthered the public interest for him to be a whistleblower under the WPA, I would conclude that this requirement is satisfied. The public interest is served when a violation of the law by a public official is reported. See *Dolan*, 454 Mich at 378 n 9 ("Violations of the law . . . by governments and by the men and women who have the power to manage them are among the greatest threats to the *public welfare.*") (quotation marks and citation omitted); see also *Gray v Galesburg*, 71 Mich App 161, 163; 247 NW2d 338 (1976) ("On the part of the city there has been conceded the right to prosecute the Grays for an alleged violation of a city ordinance, clearly a public interest."). In this case, it is undisputed that plaintiff reported Smiley's violation of Ordinance 68C to a public body. Although it may have been necessary for the city to adjust its budget to preserve essential public services and avoid terminating the employment of its employees, balancing the budget through a "gentlemen's agreement"[3] in violation of one of its own ordinances hardly seems to serve the public interest. The public certainly has an interest in whether the city is

[3] In footnote 14 of the majority opinion, the majority describes as "cynical" my use of the phrase "gentlemen's agreement," as if it is my own derogatory spin on the facts. Meanwhile, the majority avoids the phrase like the plague, describing the agreement instead as a "decision to waive the ordinance." But the description, "gentlemen's agreement," was coined by Smiley himself. It was used extensively throughout the trial by the parties and the witnesses. Even our Supreme Court used it. *Whitman,* 493 Mich at 307. Smiley testified that when plaintiff raised the issue of payment for vacation days, Smiley responded "we had a gentlemen's agreement." An example of a spin on the facts might include the majority's description of plaintiff's acts as "selfish," or its effort to

conducting its business within the parameters of the law.[4]
Plaintiff's report to a public body of Smiley's violation of
the ordinance was in the public's interest.

Accordingly, I would conclude—as our Supreme
Court did—that plaintiff engaged in protected activity
under the WPA. In other words, plaintiff is a whistle-
blower.[5]

## II. CAUSAL CONNECTION

The majority also holds that "the evidence is over-
whelming that plaintiff's so-called 'whistleblowing' had

---

characterize Ordinance 68C as a "standard, garden-variety collective-
bargaining provision for wages and benefits," a "perk," and "not a law
that protects the public interest."

[4] I also take issue with the majority's conclusion that seeking to enforce
Ordinance 68C—which defendants never amended during the relevant
period—"harms the public interest." The public interest *is* furthered
when a police chief chooses to work every day to protect and serve the
public rather than taking unneeded sick, personal, and vacation time.
The majority concludes that a public servant's "personal sacrifice" in
waiving his or her rights under Ordinance 68C advances the public
interest. While the city may save expenses that way, the public will
literally not be served on the days those servants are absent from work,
taking their allotted sick, personal, and vacation time, because here, they
were repeatedly warned by the mayor that they had better "use it or lose
it" after he foisted upon them a cost-saving method in the guise of a
"gentleman's agreement." Saving taxpayer money is in the public inter-
est, but it can be accomplished legally. Plaintiff undertook to enforce an
ordinance, and as a result, nine employees were compensated for their
unused vacation time pursuant to the ordinance, for a total cost of
$17,762.93—not a vast, make-it-or-break-it amount of money in the city's
budget.

[5] In brief response to Judge O'CONNELL's rather creative concurring
opinion, this is not a contract action. The plain language of the WPA does
not allow for Judge O'CONNELL's proposed injection of an extraneous
theory of defense. And even if one considered a "gentlemen's agreement"
foisted upon the city's nonunion employees a contract, there was no
consideration. Furthermore, a contractual provision to violate the law is
not enforceable. *Rory v Continental Ins Co*, 473 Mich 457, 470; 703 NW2d
23 (2005).

no connection to the mayor's decision to not reappoint him as police chief," and thus, defendants are entitled to JNOV. I disagree.

With its repeated references to plaintiff's other alleged misdeeds, as "weighed against" his retaliation evidence, the majority opinion reads much like a factfinder's conclusions. But the task before us is not to weigh the evidence and decide who we believe after reviewing a cold transcript. We are not jurors, and we were not at the trial. When determining whether the trial court should have granted a directed verdict or a motion for JNOV, our task is to "review the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted."[6] *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000). "The trial court cannot substitute its judgment for that of the factfinder, and the jury's verdict should not be set aside if there is competent evidence to support it." *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 194; 600 NW2d 129 (1999). Here, plaintiff presented competent evidence to support his theory of the case.

In its opinion, the Supreme Court appears to suggest, without deciding, that a question of fact exists concerning causation:

> To recover under the WPA, Whitman must therefore establish a causal connection between this protected conduct and the adverse employment decision by demonstrating that his employer took adverse employment action *because of* his protected activity. *At trial, Whitman presented evidence that his reporting of the Ordinance 68C*

---

[6] We review de novo a trial court's denial of a motion for directed verdict or JNOV. *Abke v Vandenberg*, 239 Mich App 359, 361; 608 NW2d 73 (2000).

*violation made a difference in the Mayor's decision not to reappoint him and the Mayor, in turn, presented evidence to the contrary.* However, because the Court of Appeals did not address the issue of causation when it held that Whitman's WPA claim failed as a matter of law, this question must be resolved on remand for the purpose of determining whether the circuit court's denial of defendants' motion for JNOV was proper. [*Whitman,* 493 Mich at 320 (second emphasis added).]

Under the WPA, a plaintiff must establish that "a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v Lake Co,* 493 Mich 167, 175; 828 NW2d 634 (2013) (quotation marks and citation omitted). "A plaintiff may establish a causal connection through either direct evidence or indirect and circumstantial evidence. Direct evidence is that which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the employer's actions." *Shaw v Ecorse,* 283 Mich App 1, 14; 770 NW2d 31 (2009).

> Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action. A plaintiff may " 'present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful [retaliation].' " Once a plaintiff establishes a prima facie case, "a presumption of [retaliation] arises" because an employer's adverse action is "more likely than not based on the consideration of impermissible factors" . . . .
>
> The employer, however, may be entitled to summary disposition if it offers a legitimate reason for its action and the plaintiff fails to show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a "motivating factor" for the employer's adverse action. "[A] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but

that it was a pretext for [unlawful retaliation]." [*Debano-Griffin*, 493 Mich at 176 (citations and quotation marks omitted).]

Viewing the evidence presented at trial in the light most favorable to plaintiff, there was sufficient evidence for a reasonable juror to conclude that plaintiff's reporting of Smiley's violation of Ordinance 68C was a motivating factor in Smiley's decision not to reappoint plaintiff. See *id.*; see also *Shaw*, 283 Mich App at 14. As discussed in my previous dissenting opinion in this case, the following evidence of causation was presented at trial:

First, there was evidence that Smiley was aware that plaintiff reported the ordinance violation. In his January 9, 2004, letter to Smiley, plaintiff stated: "I do not feel that issuing a confidential memo that affects ones [sic] wages and benefits that are set by ordinance can supersede that very ordinance. To ignore issues specified in that ordinance would be a direct overt violation of that ordinance and I fully intend to address the violation should it occur." At the January 12, 2004, staff meeting, plaintiff told Smiley that he had talked to the city attorney about the payout issue, that refusing to pay employees for unused days was an ordinance violation, and that he expected the violation to be addressed. There was also testimony that Smiley was aware of plaintiff's January 23, 2004, letter to Hamilton, wherein plaintiff reported the violation. Although Smiley testified that he did not discuss the letter with Hamilton, Hamilton testified that he did, in fact, tell Smiley about the letter. It is the fact-finder's responsibility to determine the credibility and weight of the testimony. *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 491; 668 NW2d 402 (2003).

Further, although there was evidence that there may have been a variety of reasons for Smiley's decision not to reappoint plaintiff, such as plaintiff's allegedly inadequate discipline of the officers who stopped Smiley after his visit to the local bar, sexually explicit e-mails sent by plaintiff,

and other reasons described by the majority, there was also evidence that plaintiff's reporting of the ordinance violation was another reason that made a difference in Smiley's decision. On June 7, 2004, Smiley sent plaintiff a letter stating that he was considering removing plaintiff as police chief. Plaintiff testified that at their meeting later that day, Smiley angrily pointed at his face and yelled, "You threatened to have me prosecuted over the 68C vacation pay issue." [Mark] Udell's meeting notes stated: "Mayor—no trust—68-C (vacation)—lack of communication . . . ." While Smiley did not immediately fire plaintiff as threatened, and plaintiff remained police chief through November 2007, a reasonable juror could have concluded that the Ordinance 68C issue was still on Smiley's mind when he decided not to reappoint plaintiff. The incident when plaintiff allegedly failed to adequately discipline the police officers who had stopped Smiley's vehicle after he left the bar, which was one of Smiley's purported reasons for not reappointing plaintiff, occurred in March 2004. Thus, by Smiley's own admission, there were incidents going back as far as 2004 that made a difference in his decision-making in 2007.[7] Moreover, at the December 2007 meeting of city police lieutenants and sergeants, just after plaintiff's discharge, Smiley mentioned that he and plaintiff "got off on the wrong foot" because of the Ordinance 68C issue. Plaintiff testified that after the meeting, which he had not attended, he asked two sergeants and a lieutenant whether the reason for his discharge had been discussed. They all said that the reason had been discussed and that "it all goes back to" the Ordinance 68C issue. Sergeant Odette testified that Smiley said that he had not been happy with plaintiff since early after his appointment, citing the pay-

---

[7] The majority contends that Smiley did not reappoint plaintiff "almost *immediately* after learning about these numerous, other valid reasons in late 2007." This was Smiley's testimony, but there was substantial evidence to the contrary, casting doubt on his credibility. For example, Smiley himself testified that he learned about the e-mail issue a year earlier in the fall of 2006, and there was evidence that he knew years earlier (the spring of 2004) about plaintiff's discipline of the officers who pulled Smiley's car over after he left a bar.

out issue. [*Whitman v City of Burton*, 293 Mich App 220, 240-242; 810 NW2d 71 (2011) (BECKERING, J., dissenting).]

The majority lists a variety of reasons why there is no causal connection between plaintiff's reporting of the ordinance violation and Smiley's decision not to reappoint him. However, none of the reasons offered by the majority justifies the conclusion that there is no causal connection as a matter of law.

First, the majority opines that there is no causal connection because Smiley "viewed the 68-C issue . . . as presenting an example of how plaintiff was untrustworthy." The majority references the notes that Udell took at the June 2004 meeting, which state, "Mayor—no trust—68-C (vacation)—lack of communication . . . ." According to the majority, this evidence establishes that Smiley decided not to reappoint plaintiff because he did not trust plaintiff, not because plaintiff was a whistleblower. The majority views the evidence of the June 2004 meeting in a light most favorable to defendants, the moving parties, which is improper when reviewing a motion for JNOV. See *Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009). There was evidence presented that at the June 2004 meeting, Smiley yelled at plaintiff, "You threatened to have me prosecuted over the 68C vacation pay issue." Even assuming on the basis of this evidence that Smiley decided not to reappoint plaintiff because he did not trust plaintiff, it can be reasonably inferred that Smiley's distrust of plaintiff was predicated on plaintiff's reporting of Smiley's violation of Ordinance 68C. Thus, even when the matter is framed in terms of trust as opposed to whistleblowing, it remains that Smiley decided not to reappoint plaintiff "because of his protected activity." *Whitman*, 493 Mich at 320 (emphasis omitted).

Second, the majority concludes that the temporal gap between plaintiff's reporting of the ordinance violation and Smiley's decision not to reappoint him "belies any causal connection between the two." In support of their conclusion, the majority cites cases from other jurisdictions for the proposition that large temporal gaps between protected activity and alleged retaliatory acts have been fatal to retaliation claims. However, it is well established in many jurisdictions that "[t]he mere passage of time is not legally conclusive proof against retaliation." *Robinson v Southeastern Pennsylvania Transp Auth, Red Arrow Div*, 982 F2d 892, 894 (CA 3, 1993); see also, e.g., *Shirley v Chrysler First, Inc*, 970 F2d 39, 44 (CA 5, 1992) (stating that temporal proximity "is part of our analysis, but not in itself conclusive of our determinations of retaliation"); *Castillo v Dominguez*, 120 Fed Appx 54, 57 (CA 9, 2005) (stating that a lack of temporal proximity may make it more difficult to show causation, but circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference of causation). Indeed, the United States Court of Appeals for the Sixth Circuit has stated, "We have never suggested that a lack of temporal proximity dooms a retaliation claim." *Gibson v Shelly Co*, 314 Fed Appx 760, 772 (CA 6, 2008). "Temporal proximity is but one method of proving retaliation." *Che v Massachusetts Bay Transp Auth*, 342 F3d 31, 38 (CA 1, 2003). For example, where there is a lack of temporal proximity between protected activity and the adverse employment action, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference" of causation. *Kachmar v SunGard Data Sys, Inc*, 109 F3d 173, 177 (CA 3, 1997) (citation omitted). Some courts have found causation to exist where years have passed

between the protected activity and the adverse employment action. See, e.g., *Robinson*, 982 F2d at 894.

In this case, the lack of temporal proximity between plaintiff's reporting of the ordinance violation and Smiley's decision not to reappoint him is but one factor to consider when determining whether a causal connection exists. It is not conclusive. As previously discussed, although Smiley did not immediately fire plaintiff as threatened and plaintiff remained the police chief through November 2007, a reasonable juror could conclude that the Ordinance 68C issue was still on Smiley's mind when he decided not to reappoint plaintiff. By Smiley's own admission, there were incidents going back as far as 2004 that made a difference in his decision-making in 2007. And there was evidence in this case illustrating that Smiley's antagonism toward plaintiff arising from the ordinance issue continued through the date when Smiley declined to reappoint plaintiff and was a motivating factor in Smiley's decision.

Finally, the majority cites various "breaks in the causal chain" and alleged misconduct committed by plaintiff that they believe is fatal to plaintiff's claim. Particularly, in addition to referring to the temporal gap during which plaintiff remained the police chief, the majority opines that plaintiff's initial complaints about the ordinance did not upset Smiley and that Smiley enforced the ordinance after plaintiff complained. The majority also opines that plaintiff inadequately disciplined subordinates, sent sexually explicit e-mail messages on a city computer, discriminated against a female officer, and forged a signature on a budget memorandum.[8] By citing these facts, the majority attempts to

---

[8] The majority contends that "plaintiff has provided no evidence to refute the mayor's stated and compelling reasons for not reappointing

paint a picture of a situation where Smiley simply addressed plaintiff's objection to the vacation-payout issue without harboring any animosity toward plaintiff concerning the issue and, thus, could not have refused to reappoint plaintiff as the chief of police for any reason other than plaintiff's alleged misconduct. However, the evidence at trial, when properly viewed in a light most favorable to plaintiff, paints a different picture.

While there was evidence that there may have been a variety of reasons for Smiley's decision not to reappoint plaintiff, there was ample evidence that plaintiff's reporting of the ordinance violation was a motivating factor for the adverse employment action. Although plaintiff initially objected in March 2003 to the lack of vacation payout, plaintiff did not couch his objection in terms of an ordinance violation until January 2004; therefore, the absence of any animosity by Smiley toward plaintiff in 2003 is understandable. There was certainly evidence at trial that Smiley was upset with plaintiff over the ordinance issue after plaintiff reported Smiley's violation of the ordinance and threatened to "pursue [it] as a violation of the law" in January 2004. In particular, there was evidence that within a few months, Smiley was demonstrating an antipathetic attitude toward plaintiff. On June 7, Smiley issued a memorandum to plaintiff that requested a meeting with him the same day; in the memorandum, Smiley stated

---

him[.]" In fact, plaintiff testified at trial regarding the alleged incidents and either explained or defended his conduct, and plaintiff's counsel cross-examined defendants' witnesses regarding the issues and their significance. It was up to the jury to weigh the credibility of the witnesses and determine whether, in light of everything, the ordinance issue was a motivating factor in Smiley's termination decision. As the trial court aptly told the defense when denying their motion for a directed verdict, "when it comes to those credibility issues, that gets taken care of by that jury over there, so your motion's denied."

that plaintiff would either have to resign or be fired.
Significantly, plaintiff testified that when he met with
Smiley that day, Smiley angrily pointed his finger in
plaintiff's face and yelled, "You threatened to have me
prosecuted over the 68C vacation pay issue." Udell's notes
of the meeting reference "68-C (vacation)." And, as previ-
ously discussed, evidence was admitted at trial of state-
ments that Smiley made to various lieutenants and ser-
geants after plaintiff was not reappointed; the lieutenants
and sergeants testified that Smiley explained that he had
been unhappy with plaintiff because plaintiff had threat-
ened to have him brought up on charges of violating a city
ordinance, and that the reason for not reappointing plain-
tiff "all goes back to" the Ordinance 68C issue.[9] Portions
of Smiley's own deposition testimony were admitted at
trial, wherein he admitted that he was "very upset,"
"extremely upset," and "wasn't happy at all" with plain-
tiff's conduct concerning the ordinance issue. On the basis
of this evidence, a reasonable juror could certainly find
that plaintiff's complaints about the violation of Ordi-
nance 68C displeased Smiley, Smiley continued to be
displeased about plaintiff's complaints even when plaintiff
remained the police chief, and plaintiff's protected activity
was *a motivating factor* in Smiley's decision not to reap-
point plaintiff as the police chief. See *Debano-Griffin*, 493
Mich at 176.

[9] The majority downplays the evidence of these statements by Smiley,
opining that "[i]t is difficult to see how a statement the mayor allegedly
made *after* he had already declined to reappoint plaintiff would influence
his decision not to reappoint him." But the majority is familiar with the
concept of a confession or admission. The statements that Smiley made to
the lieutenants and sergeants obviously shed light on the reason why he
declined to reappoint plaintiff as the police chief. Reasonable minds could
(and did) find that the ordinance issue was *one of the reasons that made
a difference* in Smiley's decision not to reappoint plaintiff. Notably, the
jury found in plaintiff's favor even after hearing all of defendants'
evidence about plaintiff that the majority found so disturbing.

Accordingly, because plaintiff engaged in a protected activity and there was sufficient evidence of a causal connection between the protected activity and the subsequent decision not to reappoint plaintiff to create a question of fact for the jury, I would affirm the trial court's denial of defendants' motion for JNOV.